# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

SPECIALIZED TRANSPORTATION
OF TAMPA BAY, INC.,
        Plaintiff

vs.

NESTLE WATERS NORTH AMERICA
INC.,
        Defendant.

_____/

Case No.: 8:06-CV-421-T30EAJ

Removed from the Circuit Court
of the 13th Judicial Circuit, in and
for Hillsborough County, Florida
Case No. 06-CA-000883

## JOINT FINAL PRETRIAL STATEMENT

Specialized Transportation of Tampa Bay, Inc. ("Specialized Transportation") and Nestle

Waters North America Inc. ("Nestle") hereby file this Joint Final Pretrial Statement in

accordance with the Case Management and Scheduling Order and Local Rule 3.06(c), and state:

## I.      BASIS OF JURISDICTION

Plaintiff states that jurisdiction is proper in this Court based upon 28 U.S.C. § 1332 as far

as count 5 in that there is a controversy between citizens of different states and the amount in

controversy exceeds the sum of $75,000, exclusive of interest and costs.  Plaintiff also states that

jurisdiction is proper in this Court based upon 28 U.S.C. § 1367 as to counts 1-4.

## II.     STATEMENT OF NATURE OF ACTION

A.     Plaintiff's Position:

This is an action for the breach of several contracts or for open account between Nestle

and Specialized Transportation.  The contracts and account arise out of a business relationship

that existed between Specialized Transportation and Nestle in 2001 and 2003 under which

Specialized Transportation was a vendor of Nestle providing transportation related services and

equipment.

13683380.2

B.    Defendant's Position:

Nestle, a manufacturer of bottled water products, and Specialized Transportation, a transportation vendor, were parties to a written Letter Agreement for Trucking Services, dated as of November, 2001.  Specialized Transportation delivered Nestle bottled water products to retail outlets pursuant to the Letter Agreement, which was the only written contract in existence between the parties.

Specialized Transportation commenced this action in 2006, alleging that Nestle breached certain oral contracts and for an open account between Nestle and Specialized Transportation, which allegedly came into existence in 2002.

## III.    STATEMENT OF EACH PARTY'S CASE:

A.    Plaintiff's position:

At the time this action arose (2002), Specialized Transportation and Nestle had been doing business for over fifteen years.  Specialized Transportation provided several different services to Nestle.  First, Specialized Transportation hauled bottled water for Nestle.  Second, Specialized Transportation rented Nestle trailers for use at its Zephyrhills facility.

1.    Counts 1 and 2

Counts 1 and 2 relate to unpaid deliveries of bottled water Specialized Transportation made for Nestle.  The parties' dispute revolves around whether Specialized Transportation submitted proof of deliveries to Nestle's CASS system.  The CASS system is a third party service, which Nestle contracted with to manage its transportation system.

Specialized Transportation complied with Nestle's requirements.  We have produced a screen shot from the CASS system that indicated in September 2003 that all but four proofs of deliveries had been received by Nestle.  In addition, Specialized Transportation hand delivered

the proofs of delivery for all invoices to Christy McIntosh and Terri Heacox (employees of

Nestle) in October 2002.  In December 2002, Dr. Hines and Charles Carver (employees of

Specialized Transportation) again hand delivered to Brian Boermeester (an employee of Nestle)

proof of deliveries associated with these invoices.  Finally, in February 2003, Brenda Joiner

delivered to Nestle the proofs of delivery for a fourth time.  We have produced e-mails from

Nestle's employees acknowledging receipt of documents from Specialized, but indicating that

they had not had time to process them.

     The amount due Specialized on the unpaid invoices is $21,927.05.

2.      <u>Counts 3 and 4</u>

     Counts 3 and 4 relate to an oral agreement between Nestle and Specialized

Transportation relating to Nestle's use of Specialized Transportation's trailers at the Zephyrhills

facility.  On April 30, 2002, Specialized Transportation sent Joel Adams a letter and a lease

agreement regarding the rental of trailers to Nestle for their use at their facility to shuttle supplies

and improve the efficiency of Nestle's operation.  The lease agreement was never executed.

However, Adams and Specialized Transportation came to an oral understanding at that time

under which forty trailers were delivered over time to Nestle's property in Zephyrhills and

utilized by Nestle.  Nestle paid multiple invoices under this oral agreement, confirming that the

agreement existed and its terms.  In November 2002, Nestle terminated the agreement.  Nestle

thereafter failed to return the trailers as required under the parties' understanding and also failed

to pay certain rental charges, causing Specialized to incur $8000 to obtain the return of the

trailers ($200 a trailer times 40 trailers) and $4,725 in rental fees.

3.    Count 5

In December 2001, Nestle, through its predecessors Zephyrhills and Perrier, sent out a request for proposal to Specialized Transportation.  In response to Nestle's request for proposal in January 2002, Specialized Transportation submitted several proposals and concepts to Joel Adams, Regional Distribution Manager for Nestle.  One of those proposals was a project allowing a single truck tractor to pull twin 48-foot trailers (referred to by the parties as "doubles").  In 2002 after receiving Specialized Transportation's proposal, Joel Adams and Specialized Transportation began talking about the doubles concept in more detail.

After Adams concluded that the program was financially beneficial to Nestle, Specialized Transportation and Adams jointly developed a price per trip and analyzed the start up costs associated with the doubles program.  In connection with the ongoing dialogue and Adams assessment in February 2002, Specialized Transportation built a prototype.

After the prototype was finished, Adams took digital photographs and authored a power point presentation that was circulated to senior management of Nestle.  In addition, Specialized Transportation provided Adams (and Nestle) with its projected start-up costs (of $585,000) to undertake the project.  At that time because of their lengthy relationship, Adams was aware of Specialized Transportation's operation and the sizeable commitment of its resources that the doubles program required.  Mike Roberts, Nestle's Regional Logistics Manager and Adams's supervisor, provided Adams with authorization to enter into a pilot program.

Adams communicated to Specialized Transportation that they had authorization to begin the doubles program.  It was the understanding of the parties that if for whatever reason a final contract was not reached, Nestle would make Specialized Transportation whole for the start up costs, which were expected to be $585,000.  At that time, both parties expected a contract to be

entered into relatively quickly, within a year.  The parties planned to amortize the start-up costs

in the final contract for over three years.  Without Nestle's agreement to make Specialized

Transportation whole if the doubles program was cancelled, Specialized Transportation, which

again is a small, family owned company, would never have purchased any of the equipment or

incurred the significant costs necessary for the doubles program.

Specialized Transportation's estimate of $585,000 to start up the doubles program was

exceed by several hundred thousand dollars.  However, Specialized Transportation incurred

those costs and began delivering Nestle's product using doubles as part of the pilot program.  The

pilot program was successful.

On or about June 26, 2002, Specialized Transportation submitted to Nestle a draft of the

written contract.  It was Adams intent to pay Specialized Transportation its start up costs back

over a three year term and Specialized Transportation did not object to being paid back over a

three year term.  Adams thought that the contract would be quickly approved because of the

financial benefit that the contract provided to Nestle.  He, therefore, requested (again allegedly

with the approval of Roberts) the commencement of runs and Specialized Transportation to incur

more charges in connection with the doubles program.  Specialized Transportation made Adams

aware that it could not afford to continue to incur the large start up expenses without Nestle's

commitment that a signed contract would be forthcoming.  Adams again assured Specialized

Transportation that there would be no problem obtaining a signed contract for this project and

requested Specialized Transportation to again begin making runs under the doubles program.

Around August 2002, Adams left Nestle.  Even though Adams had left Nestle, the

doubles program continued and Nestle continued to receive the benefit of the doubles program.

For example, in October 2002, Terri Heacox, a Nestle employee, expanded the doubles program to Winn Dixie stores in south Florida.

Everything continued operating smoothly until a dispute arose between Specialized Transportation and Nestle regarding accounts receivables and payables between the two companies unrelated to the doubles program. As a result, the doubles program was terminated by Nestle and Nestle refused to re-pay Specialized Transportation its start-up costs. Specialized Transportation invoiced Nestle for the amount contained in its estimate sent to Adams, even though Specialized incurred expenses in excess of those amounts.

      B.    Defendant's position:

In December 2001, Nestle issued a written Request for Proposal (RFP) to invite experienced transportation carriers to submit proposals for dedicated trucking services for Nestle's home and office business. The RFP had nothing to do with Nestle's retail business, which is an entirely separate segment of its business for which Nestle did not appoint dedicated carriers. The RFP named Joel Adams, a Nestle employee in its Zephryhills, Florida facility, as the contact person for questions and did not imbue him with any authority to enter into an oral transportation contract.

Specialized Transportation was one of many transportation vendors utilized by Nestle to transport its Zephyrhills-brand bottled water product to its retail outlets. Specialized Transportation provided transportation delivery services pursuant to a written Letter of Agreement for Trucking Services, dated November 2001, which had been signed by both parties.

Notwithstanding that the RFP did not seek proposals relating to Nestle's retail business, in early 2002, Specialized Transportation president Bobby Webb pitched to Adams the concept of using tandem tractor trailers to transport Nestle's Zephyrhills bottled water product to its retail

outlets. After Adams put-off Webb's proposal, Webb offered to have Specialized Transportation

finance the development of the concept. At that point, Specialized Transportation began to test

the concept by making isolated trial runs to selected Nestle retail customers to determine its

feasibility and cost-efficiency inasmuch as neither Specialized Transportation nor Nestle knew

whether Nestle's customers could or would accept deliveries using tandem tractor trailers.

Specialized Transportation contends that Adams took digital photographs and authored a

power point presentation of its concept for Nestle's senior management, and that Adams'

supervisor, Michael Roberts, authorized him to enter into a "pilot program" for the use of tandem

tractor trailers. However, no photographs have been located, and no power point presentation

has been found.

Not only has Roberts denied having authorized any "pilot program," but Adams has

stated that no final agreement was reached with Specialized Transportation prior to his departure

from Nestle in March, 2002. Indeed, neither Adams nor Roberts had any authority to obligate

Nestle to any tandem tractor trailer transportation agreement providing for Nestle to pay for any

"start-up costs" incurred in the development of the tandem tractor trailer concept. In fact, it was

not the business practice of Nestle to enter into agreements obligating Nestle to pay start-up costs

for a capital program, such as a transportation vendor's development of a tandem tractor trailer

capability.

In Count 5 of its original complaint, Specialized Transportation alleged that Nestle had

breached an oral agreement, allegedly made by Adams, that if, before the end of three years,

Nestle terminated a written contract for Specialized to provide tandem tractor trailers to deliver

Nestle's product to retail outlets, Nestle would reimburse Specialized for its start-up costs in

developing the trailers, which Specialized contends was $585,000. The oral agreement was

alleged to have the same terms, including the start-up costs, as a written agreement, dated as of June 26, 2002, that was drafted by Specialized and presented to Nestle.

Neither Specialized Transportation and Nestle entered into oral transportation contracts, as evidenced by the fact that they operated pursuant to the November, 2001 Letter of Agreement for Trucking Services. Both Specialized Transportation and Nestle intended and understood that any tandem tractor trailer transportation agreement had to be set forth in a writing that was reviewed, approved and executed by officers of the company. In fact, on August 28, 2003, over a year after the alleged contract had been formed, Specialized Transportation's Bobby Webb printed out a copy of the proposed contract, signed it and submitted it to Nestle for its signature. It is undisputed that the written agreement proposed by Specialized Transportation was never reviewed, approved or executed by an officer of Nestle.

Because Nestle had not signed the written transportation contract proposed by Specialized Transportation, this Court, in a March 20, 2008, Order, this Court dismissed Count V of the original complaint on the ground that the oral agreement alleged by Specialized was not fully performable within one year of its making and was, therefore, unenforceable under the Florida Statute of Frauds, Fla. Stat. §725.01.

Specialized Transportation then filed an amended complaint, in which it pled in Count 5 the breach of another oral agreement. Notwithstanding its prior claim of an oral agreement obligating Nestle to pay Specialized Transportation's start-up costs over a three-year period, Specialized Transportation pled a new claim of an oral agreement under which Nestle allegedly agreed that if the parties did not enter into a written contract for Nestle's payment of Specialized Transportation's start-up costs, then Nestle would make Specialized Transportation whole up-front for those costs, which were expected to be $585,000 -- the same amount as set forth in the

unenforceable oral agreement pled in the original complaint.

Nestle denies the existence of this alleged oral, tandem tractor trailer transportation agreement.  Specialized Transportation has offered no explanation for why Nestle would have entered into an oral agreement under which its obligation to pay hundreds of thousands of dollars would have been triggered by Specialized Transportation's inability to obtain Nestle's signature on a written contract providing for the same obligation.  Nestle had no such agreements, oral or otherwise, with any of its transportation vendors.

Nor has Specialized Transportation offered any explanation for why Nestle would have acted other than in commercially reasonable manner.  It made no business sense for Nestle to obligate itself to pay Specialized Transportation's start-up costs when the parties did not know if the concept was feasible, Specialized Transportation had no experience with the concept, and there was no provision for any offset or credit to Nestle to account for the fact that Specialized Transportation was going to keep the equipment purchased to develop the capability.

Specialized Transportation cannot prove the existence of this oral transportation agreement, that it incurred any specific equipment costs pursuant to such an agreement (no documents evidencing its purchase of equipment having been produced) or that it mitigated any of the damages which it claims to have incurred.

In Count 3 of its Complaint, Specialized Transportation alleges the existence of yet another oral agreement with Nestle, pursuant to which Nestle purportedly agreed to rent certain trailers from, and to pay for their return to, Specialized Transportation.  Nestle denies that it had any obligation to pay for the return of any trailers to Specialized Transportation.

Specialized Transportation's remaining claims (Counts 1, 2 and 4) seek payment of invoices submitted for services allegedly performed by Specialized Transportation pursuant to

the terms of the November, 2001 Letter Agreement. Specialized Transportation is not entitled to payment of these invoices inasmuch as Specialized Transportation has no documentation proving that it complied with the requirements for payment set forth in the Letter Agreement to present bills of lading or other proof of its delivery of the merchandise for which it seeks payment (Paragraph 13), or to obtain pre-approval of any of the added charges for which it seeks payment (Paragraph 9). Furthermore, Specialized Transportation has no documentation proving that it incurred damages or that any such damages were the responsibility of Nestle. In fact, Specialized Transportation was paid by, and double-billed, Nestle for services covered by certain of Specialized Transportation's invoices.

Accordingly, it is Nestle's position that Specialized Transportation is not entitled to any recovery on any of its claims.

## IV.   EXHIBIT LISTS

Specialized Transportation's Trial Exhibit List is attached hereto as Exhibit "A."

Nestle's Trial Exhibit List is attached hereto as Exhibit "B."

## V.   WITNESS LISTS

A.   Plaintiff's Witness List:

1.   Charles Carver, 1850 Lee Road, Suite 320, Winter Park, FL 32789;

2.   Joel Adams, 705 W. Pottatamie St., Tecumsech, MI 49286;

3.   Bobby Webb, c/o John M. Guard, Holland & Knight LLP, 100 N. Tampa, St., Suite 4100, Tampa, FL 33602;

4.   Dr. James Hines;

5.   All necessary impeachment and/or rebuttal witnesses.

6.   All persons listed by Nestle to whom Specialized Transportation does not

object.

B.    Defendant's Witness List:

1.    Brian Boermeester, c/o Jeffrey M. Garrod, Esq., Orloff, Lowenbach, Stifelman & Siegel, P.A., 101 Eisenhower Parkway, Roseland, New Jersey  07068-1082;

2.    Paul H. Bowen, c/o Paul H. Bowen, P.A., P.O. Box 2067, Palm Harbor, Florida 34682-2067;

3.    Tracy Broers, c/o Jeffrey M. Garrod, Esq., Orloff, Lowenbach, Stifelman & Siegel, P.A., 101 Eisenhower Parkway, Roseland, New Jersey  07068-1082;

4.    Ron Kane, c/o Jeffrey M. Garrod, Esq., Orloff, Lowenbach, Stifelman & Siegel, P.A., 101 Eisenhower Parkway, Roseland, New Jersey  07068-1082;

5.    Christy McIntyre, c/o Jeffrey M. Garrod, Esq., Orloff, Lowenbach, Stifelman & Siegel, P.A., 101 Eisenhower Parkway, Roseland, New Jersey  07068-1082;

6.    Michael Roberts, 611 Winding Creek Court, Southlake, Texas  76092;

7.    Judith Steckler, c/o Jeffrey M. Garrod, Esq., Orloff, Lowenbach, Stifelman & Siegel, P.A., 101 Eisenhower Parkway, Roseland, New Jersey  07068-1082;

8.    William Trackim, c/o Jeffrey M. Garrod, Esq., Orloff, Lowenbach, Stifelman & Siegel, P.A., 101 Eisenhower Parkway, Roseland, New Jersey  07068-1082.

## VI.    EXPERT WITNESSES

There are none.

## VII.    STATEMENT OF DAMAGES SOUGHT

The damages sought, not including pre-judgment interest, are $585,000 on count 5, $21,927.05 on counts 1 and 2, $8,000 on count 3, and $4,275 on count 4.

## VIII.   DEPOSITIONS TO BE USED AT TRIAL

There are none as of this date.  However, pursuant to a June 23, 2008 Order of this Court, Nestle has been granted leave to depose three persons on August 4, 2008.  Those persons are Bobby L. Webb, Charles Carver and Paul H. Bowen.

## IX.   ADMITTED FACTS REQUIRING NO PROOF AT TRIAL

1.      Specialized Transportation is a Florida corporation with a principal place of business located in Tampa, Florida.

2.      Nestle is a Delaware corporation with its principal place of business located in Greenwich, Connecticut.

## X.   AGREED APPLICABLE PRINCIPLES OF LAW

1.      This Court has jurisdiction over the parties and the subject matter of this action.

2.      Venue is proper in this Court.

3.      Pursuant to the Erie doctrine, the claims asserted by Specialized Transportation and the defenses asserted by Nestle are each governed by the principles of Florida law, as they have been pronounced by the Florida Supreme Court.  See Venn v. St. Paul & Marine Ins. Co., 99 F.3d 1058, 1063 (11th Cir. 1996) ("The district court is *required* to follow the Florida Supreme Court's decision on an issue of Florida law under the principles of *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938).") (italics in original); see also Browning v . Peyton, 918 F.2d 1516, 1521 (11th Cir. 1990) ("In this diversity case, we are to act as if we were judges of the State of Florida, applying Florida law."). If the Florida Supreme Court has not spoken on an issue, Florida District Court of Appeals decisions control absent persuasive indication that the Florida Supreme Court would rule otherwise.  See Blanchard v. State Farm Mut. Auto Ins. Co., 903 F.2d 1398, 1399 (11th Cir. 1990).

4.      Under Florida law, in order to prove its claims for breach of contract, it is plaintiff's burden to prove (1) the existence of a contract; (2) Nestle's breach of that contract; and (3) damages resulting from that breach. Rollins, Inc. v. Butland, 951 So.2d 860, 876 (Fla. 2nd D.C.A. 2006), rev. den. *sub nom.*, Butland v. Rollins, Inc., 962 So.2d 335 (Fla. 2007); A.R. Holland, Inc. v. Wendco Corp., 884 So.2d 1006, 1007 (Fla. 1st D.C.A. 2004); AIB Mortg. Co. v. Sweeney, 687 So.2d 68, 69 (Fla. 3rd D.C.A. 1997); accord New Lenox Indus., Inc. v. Fenton, 510 F.Supp.2d 893, 905 (M.D. Fla. 2007) (citing Beck v. Lazard Freres & Co., LLC, 175 F.3d 913, 914 (11th Cir. 1999) ("The elements of a breach of contract action are:  (1) a valid contract, (2) a material breach, and (3) damages.")); Raber v. Osprey Alaska, Inc., 187 F.R.D. 675, 680 (M.D. Fla. 1999) (citing cases) ("Under Florida law, recovery under a claim of breach of contract is limited to situations where the plaintiff establishes the existence of a contract, breach of that contract, and damages flowing from that breach.")); Anthony Distribs., Inc. v. Miller Brewing Co., 941 F. Supp. 1567, 1574 (M.D. Fla. 1996).

5.      In seeking to establish the existence of an oral contract, plaintiff bears the burden of presenting evidence which preponderates by the greater weight. Metropolitan Dade County v. Estate of Hernandez, 591 So.2d 1124, 1124 (Fla. 3rd D.C.A. 1992) (citing cases).

6.      "A contract is made under Florida law when the three elements of contract formation are present:  offer, acceptance, and consideration.'" In re Harrell, 351 B.R. 221, 241 (Bankr. M.D. Fla. 2006) (quoting Pezold Air Charters v. Phoenix Corp., 192 F.R.D. 721, 725 (M.D. Fla. 2000) (citing Air Prods. & Chems., Inc. v. The Louisiana Land Exploration Co., 806 F.2d 1524, 1529 (11th Cir. 1986))).

7.      An oral contract is similarly "subject to the basic requirements of contract law such as offer, acceptance, consideration, and sufficient specification of essential terms." St. Joe

Corp. v. McIver, 875 So.2d 375, 381 (Fla. 2004); see Hogan v. Supreme Camp of American

Woodmen, 1 So.2d 256, 258 (Fla. 1941) ("A valid contract requires both capacity of parties and

consideration."); see also Leesburg Comm. Cancer Ctr. v. Leesburg Reg. Med. Ctr., Inc., 972

So.2d 203, (Fla. 5th D.C.A. 2007) ("We start with the basic premise that no person or entity is

bound by a contract absent the essential elements of offer and acceptance (its agreement to be

bound to the contract terms), supported by consideration.").

       8.     Section 725.01 of the Florida Statute of Frauds prohibits the enforcement of "any

agreement that is not to be performed within the space of 1 year from [its] making" unless there

exists a writing signed by the party against whom enforcement is sought.  Fla. Stat. §725.01

(2007); Advanced Prot. Techs., Inc. v. Square D Co., 390 F.Supp.2d 1155, 1161 (M.D. Fla.

2005).

       9.     By operation of Florida law, an oral contract whose duration exceeds one year is

unenforceable in the absence of a signed writing.  See Tanenbaum v. Biscayne Osteopathic

Hosp., Inc., 190 So.2d 777, 778 (Fla. 1966) (holding that the Florida Statute of Frauds bars a

five-year, oral contract); Niagara of Fla., Inc. v. Niagara Therapy Mfg. Corp., 231 So.2d 277,

277 (Fla. 2nd D.C.A. 1970) (three-year contract); Manas v. Southern Diversified Indus., Inc.,

193 So.2d 480, 481 (Fla. 3rd D.C.A. 1967) (same).

      10.    Nestle bears the burden of proving any of its affirmative defenses by the greater

weight of the evidence.

## XI.   ISSUES OF FACT TO BE LITIGATED

      A.    Specialized Transportation submits that the following statements accurately set

forth the issues of fact remaining for trial.  Nestle does not agree.

      1.    Whether Specialized Transportation performed transportation services for Nestle

in between October 2001 and May 2003, for which it is entitled to payment of pursuant to the parties November 28, 2001 Agreement;

2.      Whether Nestle failed to make payment to Specialized Transportation for those transportation services;

3.      The amount, if any, Nestle failed to pay to Specialized Transportation for those transportation services;

4.      Whether Nestle and Specialized Transportation had an oral agreement under which Specialized Transportation rented Nestle trailers;

5.      Whether Nestle breached the terms of that oral agreement by failing to return the trailers to Specialized Transportation or to pay Specialized Transportation for retrieving those trailers;

6.      The amount, if any, Specialized Transportation was damaged by Nestle's failure to return the trailers;

7.      Whether Nestle breached the terms of that oral agreement by failing to pay rent for the use of Specialized Transportation's trailers;

8.      The amount, if any, Nestle failed to pay to Specialized Transportation for the rental of those trailers;

9.      Whether Nestle and Specialized Transportation entered into an oral agreement relating to the doubles program;

10.     Whether Nestle breached that agreement when it failed to finalize a written contract and refused to pay Specialized Transportation its start-up costs;

11.     The amount of start-up costs, if any, that Nestle failed to pay Specialized Transportation; and

12.     Whether the oral agreement with Specialized Transportation was intended to be performed within a year.

B.     Nestle submits that the following statements accurately set forth the issues of fact remaining for trial.  Specialized does not agree.

1.     Whether Specialized Transportation performed transportation services for Nestle in between October 2001 and May 2003, for which it is entitled to payment pursuant to the parties' Letter of Agreement for Trucking Services, dated as of November, 2001.

2.     Whether Specialized Transportation presented a bill of lading, signed by both Specialized Transportation and Nestle, as proof of delivery with respect to its claims in counts one and two of the amended complaint for payment of the following invoices: ZH24483; ZH25666; ZH25668; ZH25672; ZH25715; ZH26018; ZH26722; ZH26944; ZH27476; ZH27477; ZH27691; ZH28048; ZH28262; ZH29365; ZH29366; ZH29367; ZH30277; ZH30278; and ZH30742.

3.     Whether Specialized Transportation obtained written pre-approval from Nestle for accessorial charges with respect to its claims in counts one and two of the amended complaint for payment of the following invoices:  ZH26018; ZH26818; ZH27120; ZH27323; ZH28943; ZH29177; ZH29886; and ZH29888.

4.     Whether Specialized Transportation incurred actual damages, as sought in counts one and two of the amended complaint with respect to invoice ZH27794, that were the proximate result of any action taken on the part of Nestle.

5.     Whether Specialized Transportation double-billed or otherwise received payment of the following invoices with respect to its claims under counts one, two and four of the amended complaint:  ZH26820; ZH27379; ZH28583; ZH29204; ZH29205; ZH29295; ZH29701;

ZH30907; ZH30908; ZH31090; ZH31093; ZH31113; ZH31116; and ZH31132.

6.     Whether Nestle and Specialized Transportation had an oral agreement under which Specialized Transportation rented trailers to Nestle and Nestle was obligated to pay for their return to Specialized Transportation.

7.     Whether Nestle breached the terms of an oral agreement under which Specialized Transportation rented trailers to Nestle and Nestle was obligated to pay for their return to Specialized Transportation.

8.     The amount, if any, Specialized Transportation was damaged by Nestle's failure to return the trailers or to pay for the rental of those trailers.

9.     Whether Nestle intended to be bound by a three-year, tandem tractor trailer transportation agreement obligating it to pay Specialized Transportation's start-up costs, only upon the execution by an officer of each party of a written contract; and if not, whether Nestle intended to be bound by an oral tandem tractor trailer transportation agreement obligating it to pay those same start-up costs if the written agreement were not finalized.

10.     Whether the parties had mutually agreed upon all of the material terms of an oral tandem tractor trailer transportation agreement obligating it to pay Specialized Transportation's start-up costs if a written, three-year transportation agreement were not finalized.

11.     Whether the parties were still negotiating the specific term of the three-year, tandem tractor trailer transportation agreement which would have obligated Nestle to pay Specialized Transportation's start-up costs; and if so, whether the parties had reached a meeting of the minds that Nestle would be obligated under an oral tandem tractor trailer transportation agreement to pay those same start-up costs if the written agreement were not finalized.

12.     Whether Joel Adams had the authority to obligate Nestle to a three-year, tandem

tractor trailer transportation agreement obligating it to pay Specialized Transportation's start-up costs, in the absence of a written contract signed by an officer of Nestle; and if not, whether Adams had the authority to obligate Nestle to an oral tandem tractor trailer transportation agreement obligating it to pay those same start-up costs if the written agreement were not finalized.

13.     Whether it was consistent with Nestle's business practice to have entered into a three-year, tandem tractor trailer transportation agreement obligating it to pay Specialized Transportation's start-up costs, in the absence of a written contract signed by an officer of Nestle; and if not, whether Nestle intended to be bound by an oral tandem tractor trailer transportation agreement obligating it to pay those same start-up costs if the written agreement were not finalized.

14.     Whether Specialized Transportation's presentation of a proposed form of written agreement for submission to Nestle's corporate officers demonstrates Specialized Transportation's and Nestle's mutual understanding that no tractor trailer transportation agreement proposed by Specialized would become binding unless and until it had been reviewed, approved and executed by a Nestle officer.

15.     Whether, assuming the existence of an enforceable, oral tractor trailer transportation agreement obligating Nestle to pay Specialized Transportation's start-up costs if a three-year written transportation agreement were not finalized, Specialized Transportation purchased tractors, trailers and other equipment allegedly necessary to develop the tandem trailer capability and, if so, whether Specialized Transportation incurred actual damages in the amount of $585,000 as a proximate result of Nestle' alleged failure of performance of the oral tractor trailer transportation agreement alleged by Specialized Transportation.

16.    Whether Specialized Transportation and Nestle intended that the oral tandem tractor trailer transportation agreement obligating Nestle to pay Specialized's start-up costs if a three-year written agreement were not finalized, was intended to be performed within one year of its making.

17.    Whether Specialized Transportation mitigated its damages by using equipment purchased for the development of the tandem tractor trailer capability to perform transportation services for other customers, to generate revenue or to otherwise take reasonable steps to reduce and minimize its damages.

C.    Specialized Transportation further submits that the following facts are not in dispute.  Nestle does not agree.

1.    Joel Adams was the Regional Distribution Manager for the southeastern United States for Nestle in 2001-2002.

2.    In multiple documents, Nestle represented to Specialized Transportation that Joel Adams had authority regarding the provision of transportation services in the southeastern United States.  He was always listed as the highest point of contact for the southeastern United States on behalf of Nestle.

3.    In the request for proposal at issue in this case, Nestle designated Joel Adams as the sole point of contact to respond with proposals, ask questions regarding the request for proposal, and negotiate any resulting contract.

4.    Nestle never provided Specialized Transportation with any document requiring all contracts to be in writing.

5.    Nestle never provided Specialized Transportation with any document indicating any limit to Adams's authority or detailing the extent of his authority.

6.     Nestle never provided Specialized Transportation with any policy requiring approval by any supervisor or manager above Adams to approve any contract.

7.     Nestle desired to cut its transportation costs for delivering bottled water in December 2001 and sent a request for proposal to its transportation services providers as a part of that effort.  Because Nestle shipped on a truckload basis, this meant that Adams needed to figure out how to increase the number of bottles of water shipped on each truck.

8.     Specialized Transportation provided Nestle a proposal reducing its transportation costs in accordance with the request.

9.     Adams contacted Specialized Transportation regarding their proposal. Specifically, Adams began talking to Specialized Transportation regarding their doubles concept.

10.     Adams concluded that the doubles program was financially beneficial to Nestle, and would reduce his transportation costs in accordance with Nestle's goals.

11.     Specialized Transportation and Adams jointly developed a price per trip and analyzed the start up costs associated with the doubles program.

12.     In connection with the ongoing dialogue and Adams's assessment in February 2002, Specialized Transportation built a prototype.

13.     After the prototype was finished, Adams took digital photographs and authored a power point presentation that was circulated to senior management of Nestle.

14.     In addition, Specialized Transportation provided Adams (and Nestle) with its projected start-up costs (of $585,000) to undertake the project.

15.     Adams communicated to Specialized Transportation that they had authorization to begin the doubles program.

16.   Adams and Specialized Transportation both believed that his authorization to proceed created an agreement.

17.   The terms of the agreement were simple  If for whatever reason a final transportation contract between Nestle and Specialized Transportation was not reached for the doubles program, Nestle would pay Specialized Transportation the start-up costs incurred.

18.   The parties worked together to develop an estimate that both viewed as fair and reasonable.  The estimate that the parties jointly came up with was $585,000.

19.   Both parties expected a final contract to be entered into relatively quickly and repayment of Specialized Transportation's costs.

20.   Adams was the only Nestle employee with whom Specialized Transportation negotiated this agreement.

21.   Specialized Transportation purchased tractors, trailers, dollies, and other equipment and supplies for the pilot program and incurred labor charges, refurbishing and retrofitting equipment for use in the doubles program.

22.   Specialized Transportation's estimate of $585,000 to start up the doubles program was exceed by several hundred thousand dollars.  However, Specialized Transportation incurred those costs and began delivering Nestle's product using doubles as part of the pilot program.

23.   The doubles program was initially successful.

24.   On or about June 26, 2002, Specialized Transportation submitted to Nestle a draft of the written contract.

25.   Adams thought that the contract would be quickly approved because of the financial benefit that the contract provided to Nestle.

26.   Around August 2002, Adams left Nestle.

27.     Even though Adams had left Nestle, the doubles program continued and Nestle continued to receive the benefit of the doubles program.

28.     For example, in October 2002, Terri Heacox, a Nestle employee, expanded the doubles program to Winn Dixie stores in southeastern Florida.

29.     Everything continued operating smoothly until a dispute arose between Specialized Transportation and Nestle regarding accounts receivables and payables between the two companies unrelated to the doubles program.  That dispute concerned Specialized Transportation's refusal to pay roughly $2,200 in invoices when it was owed substantially more money by Nestle.

30.     As a result, Nestle terminated the doubles program and refused to repay Specialized Transportation its start-up costs.

31.     The total amount of expenses and costs incurred by Specialized Transportation for the doubles program was $946,998.

D.     Nestle further submits that the following facts are not in dispute.  Specialized does not agree.

1.     Nestle is a manufacturer of the Zephyrhills-brand bottled water product, which it sells to its retail customers (*i.e.*, supermarkets) and delivers to its branch facilities from which Nestle makes deliveries to its "home-and-office" customers.

2.     Nestle utilized trucking companies for the delivery of its Zephyrhills-brand bottled water products to customers in its retail business.

3.     Specialized Transportation is a trucking company that, from time to time during the period of October, 2001 through May, 2003, delivered Nestle's Zephyrhills-brand bottled water product to Nestle's retail customers in south Florida.

4.      Specialized Transportation performed transportation delivery services for Nestle pursuant to a two-page, written Letter of Agreement for Trucking Services, dated as of November, 2001.

5.      The only written agreement entered into by Specialized Transportation and Nestle for the performance by Specialized Transportation of transportation services for Nestle was the November, 2001 Letter Agreement.

6.      The concept of utilizing a tandem tractor trailer configuration for retail deliveries was not originated by Nestle, but rather was proposed by Specialized Transportation.

7.      Specialized Transportation did not have any prior experience with a tandem tractor trailer configuration, including the development, the construction, the state licensure and/or certification, and the operation of any such configuration.

8.      Neither Specialized Transportation nor Nestle was aware of whether Nestle's south Florida retail customers could accommodate or would permit Nestle to utilize a tandem tractor trailer configuration for the delivery of its Zephyrhills bottled water products.

9.      In March, 2002, Adams' immediate supervisor, Michael Roberts, left Nestle's employ.

10.     Ron Kane succeeded Michael Roberts as Adams' immediate supervisor upon Roberts' departure from Nestle.

11.     In August, 2002, Adams left Nestle's employ.

12.     Prior to Adams' departure from Nestle, Specialized Transportation and Nestle had not executed any written agreement by which Specialized Transportation was to provide tandem-trailer transportation delivery services for Nestle for a three-year period.

13.     Specialized Transportation was informed by Adams that its proposed, three-year tandem tractor trailer transportation agreement had to be submitted to Nestle's headquarters for review, approval and execution by an officer of Nestle.

14.     Following Adams' departure from Nestle in August, 2002, Specialized Transportation requested that Nestle sign a written, three-year tandem tractor trailer transportation agreement prepared by Specialized Transportation.

15.     The written, three-year tandem tractor trailer transportation agreement prepared by Specialized Transportation was never reviewed, approved or executed by an officer of Nestle.

16.     No written agreement providing for the specific use of a tandem trailer configuration was ever entered into by and between Specialized Transportation and Nestle.

## XII.   ISSUES OF LAW TO BE DETERMINED BY THE COURT

A.     Specialized submits that the following are the issues of law to be determined by the Court:

1.     Whether Nestle waived its lack of authority defense by failing to plead it as an affirmative defense.

2.     Whether equitable estoppel applies to any facts pled in this case by Nestle.  Under Florida law, the elements of estoppel are: (1) a representation of a material fact by Specialized Transportation that is contrary to a position it later asserts; (2) reliance by Nestle on that representation; and (3) a change in position by Nestle to its detriment based on the representation and its reliance.  *See Goodwin v. Blu Murray Ins. Agency, Inc.*, 939 So. 2d 1098, 1103 (Fla. 5th DCA 2006).

3.     Whether waiver applies to any facts pled in this case by Nestle.  Under Florida law, the elements of waiver are: (1) Specialized Transportation must have possessed a right,

privilege, advantage, or benefit; (2) the actual or constructive knowledge of the right by

Specialized Transportation; and (3) an intention to relinquish the right. *See id.* at 1104.

4.      Whether the oral agreement contained in Count V contains a liquidated damages

provision. *See, e.g., RKR Motors, Inc. v. Associated Uniform Rental & Linen Supply, Inc.*, case

no. 3D05-2130, ___ So. 2d ____, 2006 WL 3019582 (Fla. 3d DCA Oct. 25, 2006); *Action*

*Orthopedics, Inc. v. Techmedia, Inc.*, 759 F. Supp. 1566, 1569 (M.D. Fla. 1991).

5.      Whether the damages that could be caused if a final agreement were not reached

were readily ascertainable. *See MCA Television Ltd. v. Public Interest Corp.*, 171 F.3d 1265,

1271 (11th Cir.1999) (quoting *Lefemine*, 573 So.2d at 327).

6.      Whether the stipulated sum ($585,000) was grossly disproportionate to the

amount of damages that could occur to Specialized Transportation. *See MCA Television Ltd. v.*

*Public Interest Corp.*, 171 F.3d 1265, 1271 (11th Cir.1999) (quoting *Lefemine*, 573 So.2d at

327).

7.      Whether mitigation of damages is an available defense to a liquidated damages

provision. Under the common law, mitigation of damages is not a viable defense to a contract

that liquidates the damages for its breach. *See, e.g., Ross v. Garner Printing Co.*, 285 F.3d 1106,

1113-14 (8th Cir. 2002); *Aramark Uniform Services v. Meylan Enterprises, Inc.*, 2007 WL

1532329, at *6 (Neb. App. May 29, 2007); *Lake Ridge Academy v. Carney*, 613 N.E.2d 183, 190

(Ohio 1993); *Wassenaar v. Panos*, 331 N.W.2d 357, 369 (Wis. 1993); *Seco Chemicals, Inc. v.*

*Stewart*, 349 N.E.2d 733, 739-40 (Ind. App. 1976); *Musman v. Modern Deb, Inc.*, 50 A.D. 2d

761, 762 (N.Y.  App. 1975).

8.      Whether Adams acted within his actual authority at Nestle in promising

Specialized Transportation to pay its start-up costs if a final contract was not awarded.  Under

Florida law that authority may be inferred from acts, conduct, and other circumstances. *See*

*Bradley v. Waldrop*, 611 So. 2d 31, 32 (Fla. 1st DCA 1992). Further, a principal can be liable for

his agent's acts, even if not explicitly authorized, if the agent acted within the scope of his

authority. *See id.* at 33; *Burnett v. Britto*, 478 So. 2d 845 (Fla. 3d DCA 1985). An agent's

conduct is within his "scope" if the conduct engaged in is the kind of conduct that the agent was

employed to perform and was activated in part by a purpose to serve its principal. *See Whetzel v.*

*Metropolitan Life Insurance Co.*, 266 So. 2d 89, 91 (Fla. 4th DCA 1972).

      9.     Whether Adams acted within his apparent authority in promising Specialized

Transportation to pay its start-up costs if a final contract was not awarded. Under Florida law,

even if an agent was not authorized, a principal can be liable for acts that are within the agent's

apparent authority. *See Almerico v. RLI Ins. Co.*, 716 So. 2d 774, 777 (Fla. 1998); *Overseas*

*Private Investment Corp. v. Metropolitan Dade County*, 47 F.3d 1111, 1114 (11th Cir. 1995).

Apparent authority exists if: (a) the principal made a representation relating to agent's authority;

(b) the injured party relied on that representation; and (c) whether the injured party changed

position in reliance upon that representation. *See Almerico*, 716 So. 2d at 777. The

representation referred to can arise even in a principal's silence. *See Overseas Private*

*Investment*, 47 F.3d at 1114. Under Florida law, the simple act of providing someone business

cards designating that person an agent was sufficient to create apparent authority. *See Hughes v.*

*Pierce*, 141 So. 2d 280, 283 (Fla. 1st DCA 1961).

      B.     Nestle submits that the following are the issues of law to be determined by the

Court:

      1.     Whether a three-year, tandem tractor trailer transportation agreement, obligating it

to pay Specialized Transportation's start-up costs, came into existence when the parties were still

negotiating its terms; and if so, whether an oral tandem tractor trailer transportation agreement,

obligating Nestle to pay those same start-up costs if the written agreement were not finalized,

also came into existence:  Because "'[a] meeting of the minds of the parties on all essential

elements is a prerequisite to the existence of an enforceable contract, … where it appears that the

parties are continuing to negotiate as to essential terms of an agreement, there can be no meeting

of the minds.'" De Vaux v. Westwood Baptist Church, 953 So.2d 677, 681-682 (Fla. 1st D.C.A.

2007) (quoting Central Props., Inc. v. Robbinson, 450 So.2d 277, 280 (Fla. 1st D.C.A. 1984),

mod. on other gds., 468 So.2d 986 (Fla. 1985)); Central Props., Inc., 450 So.2d at 280 (citing

Enid Corp., 101 So.2d 906; 11 Fla. Jur.2d, Contracts §13); Goff v. Indian Lake Estates, Inc., 178

So.2d 901, (Fla. 2nd D.C.A. 1965) ("Until the terms of an agreement have received the assent of

both parties, the negotiation is open and imposes no obligation upon either.  Without a meeting

of the minds of the parties on an essential element, there can be no enforceable contract.  Where

the parties are merely negotiating as to the terms of an agreement to be entered into between

them, there is no meeting of the minds, and consequently, no contract while the agreement is

incomplete.").

     2.    Whether a three-year, tandem tractor trailer transportation agreement, obligating it

to pay Specialized Transportation's start-up costs, came into existence when the parties intended

to memorialize the terms in a signed, written contract, which was never signed; and if so,

whether an oral tandem tractor trailer transportation agreement, obligating Nestle to pay those

same start-up costs if the written agreement were not finalized, also came into existence:

"'Where the parties intend that their verbal negotiations shall be reduced to writing as the

evidence of the terms of their agreement, there is nothing binding on them until the writing is

executed.'  Statements of future intentions, or an agreement to agree in the future, does not give

rise to an enforceable contract.'"" <u>Cohen v. Amerifirst Bank, F.S.B.</u>, 537 So.2d 1108, 1110 n.2

(Fla. 3rd D.C.A.), <u>rev. den.</u>, 547 So.2d 1209 (Fla. 1989) (quoting <u>Ocala Cooperage Co. v. Florida</u>

<u>Cooperage Co.</u>, 52 So. 13, 16 (Fla. 1910) and citing <u>Peters v. Bower</u>, 63 So.2d 629 (Fla. 1953));

<u>accord</u> <u>Cherokee Oil Co., Ltd. v. Union Oil Co.</u>, 706 F. Supp. 826, 829 (M.D. Fla. 1989); <u>see</u>

<u>Rork v. Las Olas Co.</u>, 23 So.2d 839, 843 (Fla. 1945) (quoting <u>Hinote v. Brigman</u>, 33 So.303, 305

(Fla. 1902) ("'If a party neither had nor signified an intention to close the contract until it was

fully expressed in a written instrument and attested by signatures, then he will not be bound until

the signatures are affixed.'").

   3.  Whether Specialized Transportation has satisfied its burden of proving that Nestle

authorized Joel Adams to bind Nestle to a three-year, tandem tractor trailer transportation

agreement, obligating it to pay Specialized Transportation's start-up costs; and if so, whether

Nestle authorized Adams to bind Nestle to an oral tandem tractor trailer transportation

agreement, obligating Nestle to pay those same start-up costs if the written agreement were not

finalized: See <u>Lee v. Melvin</u>, 40 So.2d 837, 838 (Fla. 1949); <u>Foye Tie & Timber Co. v. Jackson</u>,

97 So. 517, 519 (Fla. 1923). Any reliance by Specialized Transportation upon the alleged

apparent authority of Joel Adams to bind Nestle "must be reasonable and rest in the actions of or

appearances created by the principal [*i.e.*, Nestle], ... and not by agents [such as Adams] who

often ingeniously create an appearance of authority by their own acts." <u>Blunt v. Tripp Scott,</u>

<u>P.A.</u>, 962 So.2d 987, 989 (Fla. 4th D.C.A. 2007).

   4.  Whether there was valid consideration to support the creation and enforcement of

a three-year, tandem tractor trailer transportation agreement, obligating it to pay Specialized

Transportation's start-up costs; and if so, whether there was valid consideration to support the

creation and enforcement of an oral tandem tractor trailer transportation agreement, obligating

Nestle to pay those same start-up costs if the written agreement were not finalized.

      5.      Whether Section 725.01 of the Florida Statute of Frauds (agreements not to be performed within one year) precludes the enforcement of an oral tandem tractor trailer transportation agreement, obligating Nestle to pay Specialized Transportation's start-up costs if a three-year written agreement providing for the same obligation, were not finalized.

      6.      Whether Specialized Transportation has waived its right to assert, or is estopped from asserting, the existence of an enforceable, oral tandem tractor trailer transportation agreement, obligating Nestle to pay Specialized Transportation's start-up costs if a three-year written agreement providing for the same obligation, were not finalized.  See Pajcic v. American Gen'l Life Ins. Co., 419 F.Supp.2d 1380, 1382 (M.D. Fla. 2006) (citing Raymond James Finan. Serv., Inc. v. Saldukas, 896 So.2d 707, 711 (Fla. 2005) ("Under Florida law, waiver is the voluntary and intentional relinquishment or abandonment of a known and existing right or privilege which, except for the waiver, the party would have enjoyed.  * * *  Waiver can be established through express language or inferred by actions or conduct demonstrating an intent to relinquish one's rights."); Major League Baseball v. Morsani, 790 So.2d 1071 (Fla. 2001).

      7.      Whether, assuming the existence of an enforceable, oral tandem tractor trailer transportation agreement, obligating Nestle to pay Specialized Transportation's start-up costs if a three-year written agreement providing for the same obligation, were not finalized, Specialized can prove that it purchased equipment and incurred start-up costs in the amount of $585,000 and that such costs constitute actual damages proximately caused by Nestle's claimed breach of the oral agreement.  See In re New River Shipyard, Inc., 355 B.R. 894, (Bankr. S.D. Fla. 2006) (quoting Poinsettia Dairy Prods., Inc. v. Wessel Co., 123 Fla. 120, 166 So. 306, 310 (Fla. 1936) ("Damages for breach of contract are limited to those 'damages as would normally result from

the breach of contract, whether as the ordinary consequence of such breach, or as a consequence which may, under the circumstances, be presumed to have been in the contemplation of the parties at the time they made the contract as the probable result of the breach.")).

8.     Nestle objects to Specialized Transportation's contention that there is a disputed issue of law as to whether the oral tandem tractor trailer transportation agreement alleged in Count V of the amended complaint contains a liquidated damages provision, inasmuch as no such claim was made by Specialized Transportation in any pleading or in any answer to interrogatories.  To the extent that this Court considers such an issue, Nestle states that the issue is whether, assuming the existence of an enforceable, oral three-year transportation-indemnification agreement, as alleged by Specialized Transportation, the parties mutually intended to create a liquidated damages provision that is enforceable under Florida law. Specialized Transportation bears the burden of proving that the parties mutually intended to create a liquidated damages provision.  See Kuharske v. Lake County Citrus Sales, 44 So.2d 641, 643 (Fla. 1949).  Specialized Transportation must show that this remedy was "mutual, unequivocal, and reasonable." Hatcher v. Panama City Nursing Ctr., Inc., 461 So.2d 288 (Fla. 1st D.C.A. 1985).  Furthermore, Specialized Transportation must also establish that the provision is enforceable by proving that its actual damages were not readily ascertainable at the time of contract formation.  See Hutchinson v. Tompkins, 259 So.2d 129, 132 (Fla. 1972); see Kehoe v. Fidelity Bank & Trust, 421 F.3d 1209, 1213 (11th Cir. 2005) (holding that damages are readily ascertainable if they are neither uncertain nor immeasurable).

9.     Whether Specialized Transportation mitigated the damages that it claims to have incurred as a proximate result of Nestle's alleged termination of its performance of an oral, tandem tractor trailer transportation agreement, obligating Nestle to pay Specialized

Transportation's start-up costs if a three-year written agreement providing for the same

obligation, were not finalized:  The doctrine of avoidance of consequences "is no different than

the principle that an injured party has a duty to mitigate damages" and "is well-established in

Florida." Tampa Pipeline Transport Co. v. Chase Manhattan Service Corp., 928 F. Supp. 1568,

1579, 1579 n.10 (M.D. Fla. 1995), aff'd, 87 F.3d 1329 (11th Cir. 1996) (citing Graphic Assocs.,

Inc. v. Riviana Restaurant Corp., 461 So.2d 1011, 1014 (Fla. D.C.A. 1984)); see Hodges v. Fries,

34 Fla. 63, 75-76, 15 So.682, 686 (Fla. 1894) ("It is a well-established legal rule, and of constant

application, that if a plaintiff, by reasonable exertions or care, could have prevented damages

resulting to him by reason of the defendant's wrongful acts, it was his duty to do so, and, so far

as he could have thus prevented them, he cannot recover therefor."); Winter v. American Auto.

Ass'n, 149 So.2d 386, 387 (Fla. 3rd D.C.A. 1963); see also Thomas v. Western World Ins. Co.,

343 So.2d 1298 (Fla. 2nd D.C.A.), cert. dism. sub nom, Western World Ins. Co. v. Thomas, 348

So.2d 955 (Fla. 1977) ("[I]t is black-letter contract law that a party suffering a breach is

obligated to take all reasonable means to protect himself and mitigate his damages.").  Under this

rule of law, "[a] party is prevented 'from recovering those damages inflicted by a wrongdoer

which the injured party 'could have avoided without undue risk, burden, or humiliation.'"

Tampa Pipeline Transport, 928 F. Supp. at 1579 (quoting Graphic Assocs., 461 So.2d at 1014.

Consequently, where Specialized Transportation alleges a breach of contract, with only partial

performance, "the contractee first must attempt to mitigate his consequential damages with due

diligence and to the best of his ability -- and must prove that he has done so.  Next, he must

prove to a reasonable degree of certainty the amount of such damages, plus any extra expenses

necessarily incurred...." Nello L. Teer Co. v. Hollywood Golf Estates, Inc., 324 F.2d 669, (5th

Cir. 1963), cert. den., 377 U.S. 909, 84 S. Ct. 1169, 12 L.Ed.2d 178 (1964) (citing 25 C.J.S.

*Damages* §71); see Tampa Pipeline Transport, 928 F. Supp. at 1579 (citing Restatement

(Second), Contracts §350, cmt. "g" (1979) (" A party wronged by a breach of contract, in order

words, has an affirmative obligation to take reasonable steps to avoid, or minimize, loss...."); 

accord In re New River Shipyard, 355 B.R. at 907 (quoting 2 Williston on Contracts §1353 at

274 (1962) ("As a general proposition, a plaintiff must take all reasonable steps necessary to

avoid further damages, and whether the plaintiff undertook to mitigate damages is relevant to the

damage calculation. 'Damages which the plaintiff might have avoided with reasonable effort are

not caused by the defendant's wrong and, therefore, are not be charged against him.'")).

  10. Whether Specialized Transportation is entitled to payment of the invoices, which

are the subject of its amended complaint, based upon its satisfaction of the conditions precedent

to payment, as set forth in the terms of the Letter Agreement for Trucking Services, dated as of

November 2001, which governed Specialized Transportation's performance of trucking services

for Nestle: "Under Florida law, if a contract contains a condition precedent, obligations under

the contract do not mature until after the condition precedent has occurred." In re Harrell, 351

B.R. at 242 (citing Florida cases). "'It is an elementary rule that there must be at least a

substantial performance of conditions precedent in order to authorize a recovery as for

performance of a contract.'" *Id.* at 242-243 (quoting Cohen v. Rothman, 127 So.2d 143, 147

(Fla. 3rd D.C.A. 1961)). Consequently, "Florida law further provides that a contracting party's

duty to pay does not arise until the other contracting party has completed its performance." In re

Raber Indus., Inc., 8 B.R. 631, 633 (M.D. Fla. 1981).

  C. Nestle further submits that the following principles of law apply to this dispute.

Specialized Transportation does not agree that the statements apply or that the statements are an

accurate reflection of Florida law.

1.      "In order to establish the basis of a contract, there must be common intent, or a 'meeting of the minds' as to the terms of the contract." In re Everglades Mem. Hosp., Inc., 346 B.R. 223, 228 (Bankr. S.D. Fla. 2006) (citing Kuharske, 44 So.2d 641); see David v. Richman, 528 So.2d 25, 27 (Fla. 3rd D.C.A. 1988), aff'd, 568 So.2d 922 (Fla. 1990) (citing Enid Corp. v. Mills, 101 So.2d 906 (Fla. 3rd D.C.A. 1958) ("Without a meeting of the minds, there can be no contract of any kind.")).

2.      "Florida employs the 'mirror image rule' with respect to contracts.  Under this rule, in order for a contract to be formed, an acceptance of an offer must be absolute, unconditional and identical with the terms of the offer." In re Harrell, 351 B.R. at 244 n.10 (quoting Montgomery v. English, 902 So.2d 836, 837 (Fla. 5th D.C.A. 2005)).

3.      Whether the alleged contract is oral or written, plaintiff must show that the parties mutually agreed upon the material terms of the alleged contract. See Winter Haven Citrus Growers Ass'n v. Campbell & Sons Fruit Co., 773 So.2d 96, 97 (Fla. 2nd D.C.A. 2000) (quoting State v. Family Bank of Hallandale, 623 So.2d 474, 479 (Fla. 1993) ("'Mutual assent is an absolute condition precedent to the formation of a contract.'")); see also Gibson v. Courtois, 539 S0.2d 459, 460 (Fla. 1989) ("Absent mutual assent, neither the contract nor any of its provisions come into existence."); accord In re Harrell, 351 B.R. at 244 n.10 (citing Florida Supreme Court cases) ("In order to form a valid contract, actual assent by the parties upon exactly the same matters is indispensable.").

4.      "In Florida, it is well settled that '[i]n order that there be a contract, the parties must have a definite and distinct intention, common to both, and without doubt or difference. Until all understand alike, there can be no assent to the same thing in the same sense, and their minds must meet as to all the terms.'" O'Neill v. Corporate Trustees, Inc., 376 F.2d 818, 820

(5th Cir. 1967) (quoting <u>Webster Lumber Co. v. Lincoln</u>, 94 Fla. 1097, 115 So 498, 502 (Fla. 1927) and citing cases); <u>accord</u> <u>David</u>, 528 So.2d at 27 (quoting same); <u>see</u> <u>Servicios de Almacen Fiscal Zona Franca Y Mandatos S.A. v. Ryder Int'l, Inc.</u>, 2007 WL 628133 at *2 (S.D. Fla. 2007) (quoting <u>Glosser v. Vasquez</u>, 898 So.2d 1179, 1181 (Fla. 3rd D.C.A. 2005) ("'[T]he creation of a contract requires that there be a mutual or reciprocal assent to a certain and definite proposition, which is commonly referred to as a 'meeting of the minds.' * * * Thus, to create a contract and trigger contractual obligations, the parties must have a definite and distinct understanding, without which there is no assent and no contract.")).

5.    It is "a fundamental principle" of Florida contract law that "in order for a contract to be binding and enforceable, there must be a meeting of the minds on all essential terms and obligations of the contract." <u>Browning</u>, 918 F.2d at 1521 (citing <u>O'Neill</u>, 376 F.2d at 820); <u>accord</u> <u>Estate of Hernandez</u>, 591 So.2d at 1124 (citing cases) ("For an agreement to be legally enforceable, the agreement must be firm or definite in its essential terms."); <u>see also</u> <u>Servicios de Almacen</u>, 2007 WL 628133 at *2 (quoting <u>Glosser</u>, 898 So.2d at 1181 ("There is no meeting of the minds between the parties when essential terms are left open for consideration or negotiation.")).

6.    "[T]o make a parol contract void, it must be apparent that it was the understanding of the parties that it was not to be performed within a year from the time it was made." <u>Yates v. Ball</u>, 181 So. 341, 344 (Fla. 1937).

7.    "[T]he Florida Statute of Frauds, <u>Fla. Stat.</u> §725.01, bars enforcement of an oral contract that was intended by the parties to last longer than a year, even though the contract could have been terminated for cause within a year." <u>All Brand Importers, Inc. v. Tampa Crown Distribs., Inc.</u>, 864 F.2d 748, 749 (11th Cir. 1989).

## XIII.   DISAGREEMENTS AS TO APPLICATION OF FEDERAL RULES OF EVIDENCE OR FEDERAL RULES OF CIVIL PROCEDURE

1.      It is Specialized Transportation's position that all the correspondence between Paul Bowen or Bobby Webb and Judith Steckler and Ron Kane from July 2003 through December 2003 is inadmissible under Federal Rules of Evidence Rule 408(a)(2).

2.      It is Nestle's position that statements made by Specialized Transportation's counsel in his December 5, 2003, correspondence to Nestle's counsel, constitute an admission by Specialized Transportation under Federal Rule of Evidence 801(d)(2)(C) that any proposed, tandem trailer transportation agreement had to be in a writing that was submitted to, reviewed, approved and executed by a Nestle officer before it became a binding contract. See Hansen v. Waller, 888 F.2d 806, 814 (11th Cir. 1989); St. Paul Fire & Marine Ins. Co. v. Welsh, 501 So.2d 54, 57 (Fla. 4th D.C.A. 1987); cf. Hood v. Hood, 100 So.2d 422, 426 (Fla. 2nd D.C.A. 1958) (citing 31 C.J.S. Evidence §361 at 1136 (recognizing that "w[h]ere an attorney's statement embodies the operative facts of the transaction, it may be independently relevant and admissible; and even though an attorney's admission is not made under circumstances making it evidence against his client, it may be admissible to show that the attorney knew the fact admitted.")).

3.      To the extent that disagreements arise, the parties will file motions in limine three weeks before the trial term as is this Court's preference.

## XIV.   MOTIONS OR OTHER MATTERS WHICH REQUIRE ACTION BY THE COURT

No motions are currently pending.


Dated: August 4, 2008


| s/John M. Guard | s/Lannie D. Hough, Jr. |
|---|---|
| John M. Guard | Lannie D. Hough, Jr. |
| Florida Bar No. 274600 | Florida Bar No. 0149470 |

| | |
|---|---|
| Noel R. Boeke<br>Florida Bar No. 151830<br>Holland & Knight, LLP<br>100 N. Tampa St., Suite 4100<br>Tampa, Florida 33602-3644<br>Telephone: (813) 227-8500<br>Facsimile: (813) 229-0134 (fax) | Mark B. Smith<br>Carlton Fields, P.A.<br>4221 W. Boy Scout Boulevard, 10th Floor<br>Tampa, FL 33607<br>Telephone: 813-229-4333<br>Facsimile: 813/229-4133 |

David Lewis Levy
Law Office of David Lewis Levy
10225 Ulmerton Rd., Suite 9C
Largo, Florida 33771-3526
(727) 581-8787
(727) 581-0076 (fax)
levylawoffice@aol.com

Counsels for Plaintiff

Jeffrey M. Garrod
Orloff, Lowenbach, Stifelman & Siegel
101 Eisenhower Pkwy.
Roseland, New Jersey 07068
(973) 622-6200
(973) 622-3073 (fax)
JMG@olss.com

Counsels for Defendant

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 4, 2008, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the following:

| | |
|---|---|
| Lannie D. Hough, Jr., Esq.<br>Carlton Fields, P.A.<br>4221 W. Boy Scout Boulevard, 10th Floor<br>Tampa, FL  33607<br>(813) 229-4333 • (813) 229-4133 (fax)<br>lhough@carltonfields.com<br>Counsel for Defendant<br><br>Jeffrey M. Garrod, Esq.<br>Orloff, Lowenbach, Stifelman & Siegel, P.A.<br>101 Eisenhower Parkway<br>Roseland, NJ 07068<br>973-622-6200 • 973-622-3073 (fax)<br>JMG@olss.com<br>Of Counsel for Defendant | David Lewis Levy, Esq.<br>Law Office of David Lewis Levy<br>10225 Ulmerton Road, Suite 8A<br>Largo, Florida 33771-3526<br>(727) 581-8787 • (727) 581-0076 (fax)<br>levylawoffice@aol.com<br>Co-Counsel for Plaintiff |

s/ John M. Guard
John M. Guard