UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SPECIALIZED TRANSPORTATION
OF TAMPA BAY, INC.,

        Plaintiff,

v.                          Case No.  8:06-cv-421-T-33EAJ

NESTLE WATERS NORTH
AMERICA, INC.,

        Defendant.
_____/

**ORDER**

This cause comes before the Court pursuant to Nestle's motion for judgment as a matter of law (Doc. # 174), which was filed on September 30, 2008.  Specialized filed its response in opposition to Nestle's motion for judgment as a matter of law on October 28, 2008. (Doc. # 185).  On November 18, 2008, Nestle filed its reply memorandum in support of its motion for judgment as a matter of law. (Doc. # 188).

For the reasons that follow, this Court denies Nestle's motion for judgment as a matter of law.  This Court will issue a separate order addressing Nestle's motion for a new trial as well as on the other post trial motions pending before this Court.

I.    **Background**

Specialized initiated this lawsuit against Nestle in

state court, and Nestle removed the case to this Court, on the basis of diversity of citizenship, on March 13, 2006. (Doc. ## 1, 2). This case involves a dispute over the parties' contractual rights and obligations regarding delivery services Specialized provided for Nestle as well as Specialized's reconfiguration of a fleet of vehicles (the "Doubles Program") to accommodate Nestle's shipping needs.

On March 20, 2006, Nestle moved to dismiss count V of the complaint (in which Specialized sought damages for breach of an oral contract) on the basis of the operation of the Statute of Frauds, Florida Statute Section 725.01. (Doc. # 4). Specifically, count V stated, in pertinent part:

> Plaintiff provided Defendant [with] the prototype. Defendant approved the prototype and entered into an agreement whereby Plaintiff was to modify its 48 foot trailers to accommodate transporting dual trailers with one (1) tractor.
> . . . .
> The agreement was for a term of three (3) years with an option to renew. Plaintiff and Defendant agreed to the three (3) year term and that Plaintiff was able to recapture its initial start-up costs for the materials, modification and other acts concerning the use of dual trailers during the three (3) year term.

(Doc. # 2 at ¶¶ 27-29).

In response to Nestle's motion to dismiss, Specialized argued that Nestle argued that the principles of waiver and equitable estoppel precluded Nestle from asserting a statute

2

of frauds defense. (Doc. # 12). This Court denied the motion to dismiss on November 3, 2006, finding that waiver and estoppel were issues "better resolved at the summary judgment stage." (Doc. # 26 at 3). Nestle filed its answer and affirmative defenses to the complaint on November 13, 2006. (Doc. # 27). Thereafter, the parties filed cross motions for summary judgment on count V of the complaint. (Doc. ## 47, 53). On March 20, 2008, this Court granted Nestle's motion for summary judgment on count V of the complaint; however, the Court specifically allowed Specialized to file an amended complaint to correct deficiencies in the complaint. (Doc. # 66).

On April 4, 2008, Specialized filed its amended complaint. (Doc. # 68). Counts I, III, IV, and V of the complaint sought damages for breach of contract, and count II sought damages for open account. (Doc. # 68).[1] Nestle filed

---

[1] Count V of the amended complaint contains the following allegations, among others, concerning the oral contract:

> Plaintiff was requested by Defendant to develop a prototype whereby two (2) trailers could be pulled by one tractor.
> . . . .
> Defendant inspected the prototype [and] Defendant, again through Adams, was provided with Plaintiff's projected start-up costs for the project. Defendant, through Adams, reviewed and approved the start-up costs and authorized plaintiff to begin

its answer and affirmative defenses to the amended complaint on April 18, 2008. (Doc. # 71). Thereafter, the parties again filed cross motions for summary judgment on count V of the amended complaint. (Doc. ## 73, 74). This Court denied the cross motions for summary judgment on June 11, 2008. (Doc. # 78).

This case was tried before a jury during the week of September 8, 2008. (Doc. ## 142-145). During trial, Nestle moved for judgment as a matter of law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure. (Doc. # 146). The Court reserved ruling on the Rule 50(a) motion. On September 12, 2009, the jury returned a verdict in favor of Specialized

---

delivering Defendant's product utilizing doubles. As part of the parties' agreement and as a material inducement to Plaintiff to expend the money necessary to be able to deliver Defendant's product utilizing doubles, Defendant, through Adams, agreed that if a final contract was not reached between the parties regarding the doubles proposal, Defendant would pay Plaintiff the start-up costs it expended.
. . . .
Plaintiff incurred start-up costs and expenses in excess of the projected start-up costs.
. . . .
No final agreement was ever reached and Defendant terminated Plaintiff from delivering its products. Thereafter, Defendant breached its agreement with Plaintiff by failing to pay Plaintiff its start-up costs.

(Doc. # 68 at ¶¶ 33-41).

as to all five complaint counts. (Doc. # 149). This Court entered its judgment in favor of Specialized in the amount of $544,529.33 on September 16, 2008. (Doc. # 162). Thereafter, on September 30, 2008, this Court entered an amended judgment in the same amount. (Doc. # 170).[2]

The parties filed multiple post trial motions. This Court will first address Nestle's motion for judgment as a matter of law.

## II. Nestle's Motion for Judgment as a Matter of Law

Nestle seeks judgment as a matter of law as to counts I, II, and V of the amended complaint pursuant to Rules 50(a) and 50(b) of the Federal Rules of Civil Procedure.

Rule 50(a) of the Federal Rules of Civil Procedure permits the court to grant judgment as a matter of law against a party with respect to a claim or defense when a party "has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a). The Eleventh Circuit provided detailed analysis of Rule 50 of the Federal Rules of Civil Procedure in <u>Middlebrooks v. Hillcrest Foods, Inc.</u>, 256 F.3d 1241 (11th Cir. 2001):

---

[2] This Court's judgment was amended to correct a scrivener's error.

A motion for judgment as a matter of law shall specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment. This motion can be renewed after trial under Rule 50(b), but a party cannot assert grounds in the renewed motion that it did not raise in the earlier motion. The rule protects the non-moving party's right to cure deficiencies in the evidence before the case is submitted to the jury. The moving party cannot ambush the court and opposing counsel after the verdict when the only remedy is a completely new trial.

Id. at 1245 (internal citations omitted).

Courts should grant judgment as a matter of law only "if the evidence is so overwhelmingly in favor of the moving party that a reasonable jury could not arrive at a contrary verdict." Id. at 1246. Stated another way, "Under Rule 50, a court should render judgment as a matter of law when there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1192 (11th Cir. 2004). Further, in conducting a Rule 50 analysis, this Court must refrain from invading the province of the jury: "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Id. at 1193 (internal citations omitted).

Nestle asserts that it is entitled to judgment as a matter of law on count V (Specialized's claim for breach of an oral contract) for five separate and independent reasons. In

addition, Nestle asserts that it is entitled to judgment as a matter of law on counts I, II, and V because Specialized failed to take reasonable measures to preserve certain evidence. This Court will address these issues in turn.

As to count V, the jury found by a preponderance of the evidence that "Specialized Transportation and Nestle entered into an oral contract obligating Nestle to make up-front payment to Specialized Transportation of start-up costs relating to a tandem trailer configuration (the Doubles Program), if the parties did not enter into a final, written contract regarding the Doubles Program." (Doc. # 149 at 3). The jury also found that the oral contract between Specialized and Nestle was "capable of being performed in one year." (<u>Id.</u>) Furthermore, the jury found that Joel Adams, Nestle's employee, had either actual or apparent authority to bind Nestle to the oral contract and that Nestle breached the oral contract. (<u>Id.</u>). The jury awarded Specialized $585,000 for Nestle's failure to perform as to count V. (<u>Id.</u>).

Nestle seeks judgment as a matter of law on count V for the following reasons: (1) the oral agreement is an "agreement to agree," which is unenforceable as a matter of law; (2) the parties did not reach a meeting of the minds as to the start-up costs, which was an essential term of the oral agreement;

(3) the parties did not intend to be bound in the absence of a signed, written agreement; (4) the oral agreement violates the statute of frauds; and (5) Nestle was prejudiced by Specialized's failure to preserve certain evidence (spoliation).

### A. __Was the Oral Contract an Agreement to Agree?__

Nestle argues that the oral contract was an agreement to agree, which is not enforceable under Florida law. See <u>Cohen v. Amerifirst Bank</u>, 537 So.2d 1108, 1110, n.2 (Fla. 3d DCA 1989)("Statements of future intentions, or an agreement to agree in the future, do not give rise to an enforceable contract.")(citing <u>Peters v. Bower</u>, 63 So.2d 629 (Fla. 1953)). In this case, Bobby Webb, president of Specialized, testified that "the oral agreement was to develop a three-year contract and to make us whole on all of our start-up costs. It's just that simple." (Doc. # 160 at 81:12-14). Counsel for Nestle asked in follow up, "So the oral agreement was to negotiate and develop an agreement?" (<u>Id.</u> at 16-17). Webb responded in the affirmative. (<u>Id.</u> at 18).

Despite these statements by Webb, Specialized asserts that the agreement was not an unenforceable agreement to form a future agreement, but rather, was an enforceable agreement to increase its fleet to include the Doubles Program and to be

reimbursed for out of pocket costs (the start-up costs) if the
Doubles Program was terminated. Joel Adams, Nestle's former
employee, offered testimony that is consistent with
Specialized's theory. Adams testified that he was very
interested in Specialized's Doubles Program:

> Nestle's sales of water are not limited by customer
> demand. The sales are actually limited by how
> quickly we can get the product onto the shelves of
> the store. Using doubles configuration by moving
> two truckloads of product with a single tractor
> really functions as a trucking capacity multiplier;
> allows us to get more product, using the Florida
> Turnpike, into the markets down in South Florida
> much faster.

(Doc. # 158 at 145:13-21).

Adams initially "authorized" Specialized to procure the
equipment that would be used to create a test rig for the
Doubles Program. (Id. at 150:20-25). Adams testified that he
did not require a written contract because "the advantages
that we saw from a cost standpoint were so significant that we
wanted to immediately implement this in order to enjoy those
benefits for . . . Nestle Waters." (Id. at 151:7-10). Without
making a credibility determination, this Court finds that the
testimony of Webb and Adams provided the jury with a
reasonable basis to find that Nestle agreed to pay start-up
costs for the Doubles Program in the instance that a written
agreement was not signed in the future. A reasonable jury

could have determined that the oral contract was not an agreement to agree in the future, but, instead, was an agreement to protect Specialized against the loss of its investment in the Doubles Program if Nestle decided to abandon the Doubles Program, which Nestle, in fact, did. Thus, this Court declines to grant judgment as a matter of law for Nestle on the basis that the contract was a mere "agreement to agree."

### B.   **Was there a Meeting of the Minds?**

Nestle next argues that the oral contract is not enforceable because there was never a meeting of the minds between Specialized and Nestle. Specifically, Nestle asserts that the parties never agreed upon the dollar amount that Nestle would be bound to pay Specialized as start-up costs in the instance that the Doubles Program was cancelled. Specialized counters that a missing dollar amount does not preclude a meeting of the minds because the dollar amount was reasonably calculable.

The Eleventh Circuit evaluated the "meeting of the minds" requirement for enforceable oral contracts in <u>Venus Lines Agency, Inc. v. CVG Int'l Am., Inc.</u>, 234 F.3d 1225 (11th Cir. 2000). In the <u>Venus Lines</u> case, the plaintiff, Venus Lines, submitted a bid to ship goods for the defendant, CVGIA, for a

10

one year term at a fixed rate. <u>Id.</u> at 1227–1228. CVGIA accepted Venus Lines' bid in 1994. <u>Id.</u> at 1228. After Venus Lines' bid was accepted, representatives from Venus Lines and CVGIA entered into negotiations for a long term shipping contract, but an agreement acceptable to both parties was never executed. <u>Id.</u>

In 1997, after several years of dealings, CVGIA informed Venus Lines that its shipping services were no longer needed. <u>Id.</u> Thereafter, Venus Lines sued CVGIA for breach of a long term oral agreement for shipping services. <u>Id.</u> The district court held a bench trial and found that there was never a meeting of the minds because the parties did not reach an agreement as to the duration of the contract or the shipping rate. <u>Id.</u>

On appeal, the Eleventh Circuit affirmed the district court, explaining, "It is not necessary to reduce an agreement to writing to bind the parties, as long as the parties intend to be bound at the time of the oral agreement." <u>Id.</u> at 1229. Further, "Acceptance of a bid to perform services can create an enforceable contract in the absence of a written agreement." <u>Id.</u> In order to form an enforceable oral contract, the Eleventh Circuit explained, "there must be a meeting of the minds on all essential terms and obligations of

the contract." <u>Id.</u> at 1229 (internal citation omitted).  The
Eleventh Circuit determined that the district court was
correct to find that a meeting of the minds, or mutual assent,
was missing when the parties did not agree to the duration of
the agreement or the shipping rate, especially after several
years of negotiations. <u>Id.</u>

In the present case, Nestle correctly argues that the
parties did not agree to a specific amount that Nestle would
pay to Specialized if Nestle abandoned the Doubles Program.
However, this Court determines that the absence of a specific
sum does not prevent a meeting of the minds.  Adams instructed
Specialized to purchase specific pieces of equipment to test
the Doubles Program, and the Doubles Program passed the
initial tests.  Adams testified:

> Well, we did the trial.  The idea behind the trial
> was to prove that the concept can work; that the
> Florida DOT will let us do this . . . . And we were
> successful in that.  At that point it really, uh,
> became more an issue of how quickly would we be
> able to ramp this up to a larger scale.

(Doc. # 158 at 152:3-9).  Adams, eager to decrease shipping
costs for Nestle, authorized Specialized to "begin growing the
fleet" of Doubles trailers. (<u>Id.</u> at 156:1-4).  Adams testified
that during this "development phase" of the Doubles Program,
he "made assurances to Specialized that if for some reason the

program gets terminated at this point, that we would make them whole on their out-of-pocket costs." (Id. at 12-17).

When asked for clarification on what his "assurances" meant, Adams testified:

> At that point, the numbers looked so good, the returns were so strong on this, it made so much sense, that I had absolutely no doubt in my mind, uh, that we would have-—that we would negotiate-—successfully negotiate a permanent agreement very quickly.
> . . . .
> I was asking Specialized to up-front some capital in order to, uh, go forward with this--with this program. Uh, I felt that by assuming some of the risk, or the risk for doing this, would--I would enjoy a greater return on the--on the final deliverable.

(Id. at 158:8-22).

Specialized complied with Adams' request to "ramp up" the fleet, and Specialized purchased the equipment necessary to create ten Doubles trailers. (Id. at 163:1-5). It is not disputed that the exact start-up costs for the Doubles Program were unknown until after the parties entered into the oral contract; however, both Webb and Adams, individuals in the shipping industry, were capable of determining the approximate cost of purchasing ten tractors, and the trailers, dollies, and other equipment needed for initiating and then "ramping up" the Doubles Program fleet.

The absence of a specific monetary figure--Specialized's

start-up costs––did not prevent a meeting of the minds between Webb and Adams. <u>See</u> <u>Bee Line Air Transport, Inc. v. Dodd</u>, 496 So.2d 874, 875 (Fla. 3d DCA 1986)("[A] contract with an open price term will not fail for indefiniteness if the parties provide an objective method of determining price."); <u>see</u> <u>also</u>, <u>Blackhawk Heating & Plumbing Co. v. Data Lease Financial Corp.</u>, 302 So.2d 404, 408 (Fla. 1974)("Even though all the details are not definitely fixed, an agreement may be binding if the parties agree on the essential terms and seriously understand and intend the agreement to be binding on them."). It is neither necessary nor appropriate to overturn the jury's award based upon Nestle's contention that the parties lacked a meeting of the minds.

### C. <u>Was a Written Contract Required?</u>

Nestle also argues that the oral agreement was unenforceable because the parties intended to be bound by a signed, written contract for the Doubles Program. Specialized, on the other hand, asserts that no writing was required because the parties intended to be bound by the oral agreement.

It is not contested that the parties were looking into creating a written contract for the Doubles Program. Webb testified: "It was very important to me, since we had no

commitment to all of this equipment that we were modifying and building, it was very important to me to have a commitment, and had to be in writing, and [Adams] knew that." (Doc. # 159 at 129:14-17).

Furthermore, when Adams was asked, "why did you make such a promise for Nestle to pay start-up costs and not wait until the final written agreement was executed," Adams testified, "Very common practice at Nestle at the time when I was there. The business we were in was extremely fast-paced. So, oftentimes in order to initiate a program, we would come to an oral or verbal agreement and then follow up with a written contract shortly thereafter." (Id. at 158:24-25, 159:4-9).

Nestle relies upon Cherokee Oil Co., Ltd. v. Union Oil Co., 706 F. Supp. 826 (M.D. Fla. 1989) for the proposition that "when the parties intend that the negotiations be reduced to a formal writing, there is no binding contract until the writing is executed." Id. at 829. The court's holding in Cherokee Oil, in which the defendant did not intend to be bound until a written agreement was singed and where the plaintiff only "dreamed" that such contract would be signed, is inapplicable to the present case. Id.

The Florida Supreme Court held in Ocala Cooperage Co. V. Fla. Cooperage Co., 52 So. 13 (Fla. 1910), "[T]he mere

suggestion or intention to put the agreement in writing at a
subsequent time is not, of itself, sufficient to show that the
parties did not intend the parole contract to be regarded as
complete and binding without being put in writing." Id. at 16.
Harmonizing Cherokee Oil and Ocala Cooperate, the Eleventh
Circuit explained:

> Under Florida law where the parties do not intend
> to be bound by the agreement (oral or written)
> until a formal written contract is executed, there
> is no binding agreement unless and until the
> written contract is in fact executed. However, the
> parties intent, of course, is what ultimately
> controls. Simply because the parties contemplated
> the drafting of a subsequent formal, written
> contract, does not denote that they did not intend
> to be bound by their oral or written negotiations.

Lifecare Int'l, Inc. v. CD Medical, Inc., 68 F.3d 429, 436
(11th Cir. 1995)(internal citations omitted).

Based upon Adams' testimony regarding his fast-paced
industry, and Webb's testimony and actions, the jury was not
without a reasonable basis in finding for Specialized on this
point. "While the existence of ambiguity in a contract is a
question of law for the judge to decide, the intent of the
parties is an issue of fact" for the jury to decide. Bivens
Gardens Office Bldg, Inc. v. Barnett Banks of Fla. Inc., 140
F.3d 898, 905 (11th Cir. 1998). Judgment for Nestle as a
matter of law is not appropriate simply because the parties

testified that they intended to execute a written agreement in the future.

### D.   Did the Agreement Violate the Statute of Frauds?

Nestle argues that the oral agreement was for a three-year term in violation of Florida's Statute of Frauds, which prohibits enforcement of oral agreements not capable of being fully performed within one year.[3] Nestle asserts that the oral contract is identical to a written agreement for a three-year term that Nestle never signed. Specialized, on the other hand, asserts that the oral contract was for a brief period, the weeks or months between entering into the oral agreement to develop the Doubles Program and the date a written contract was executed.

The record contains evidence in support of both positions. During the trial, Webb responded in the affirmative when asked, "Was it part of your oral agreement that the start-up costs would be recovered through the rates charged by Specialized to Nestle over a three-year period?" (Doc. # 160 at 97:17-21). However, Webb offered testimony that he believed that the duration of the oral agreement was a matter of months, not years:

---

[3] See Florida Statute Section 725.01.

```
Q:    When you ramped up the Doubles Program.  What
      did Adams tell you?
A:    Said he was going to make us whole.
Q:    And when would he make you whole?
A:    Either he'd make me whole if I didn't get a --
      three-year contract, was one point.  And the
      other point would be I would recapture the
      start-up costs via the three-year contract.
Q:    Now, was that promise meant to last three
      years?
A:    The oral promise? No.
Q:    How long was the oral promise to last?
A:    Within months.
Q:    Did you accept that promise?
A:    Yes, I did.
Q:    Did you go out and -- and buy equipment?
A:    Yes, I did.
Q:    Did you go out and buy materials?
A:    Yes, I did.
Q:    Did you go out and -- or did you pay labor?
A:    Yes, I did.
Q:    Did you perform your part of the deal that you
      struck with Mr. Adams?
A:    Yes, I did.
Q:    Did Nestle perform the part of its deal that
      Mr. Adams struck with you?
A:    No, they did not.
Q:    Now, did you think you were bound by that
      promise?
. . . .
A:    Absolutely.
```

(Doc. # 160 at 160:21-15, 161:1-25).

Likewise, Adams testified that the oral agreement was
intended to last for a matter of weeks, not months or years,
because Adams believed that a written contract would be
executed quickly. (Doc. # 158 at 213:7-9).  There is
sufficient evidence in the record to support Specialized's
argument that "the oral agreement was completely separate from

the written agreement.  The oral agreement was simply intended to allow Specialized to initiate its Doubles Program in the interim period while the parties negotiated a written agreement.  It was not intended to last for three years--it was only intended to apply for several weeks or months until a written contract was executed."  (Doc. # 185 at 12).

There is no dispute that the statute of frauds prohibits enforcement of oral contracts not capable of performance within one year.  However, in this case, a reasonable juror could find that the oral agreement was capable of being performed within one year.  Accordingly, this Court denies Nestle's request for judgment as a matter of law on the statute of frauds defense.

### E. __Does Spoliation Mandate Judgment for Nestle__?

Nestle argues that it is entitled to judgment as a matter of law on count V (the oral agreement), as well as on counts I (breach of contract) and II (open account) due to Specialized's alleged spoliation of documents.  Specialized agrees that it lost some documents due to the passage of time and the fact that Specialized is no longer in business.  However, Specialized argues that it did not intentionally destroy documents and that it produced copies of documents in leu of original documents.  Furthermore, Specialized contends

that Nestle also lost most, if not all, of its documents pertaining to Specialized and that Nestle failed to preserve the issue of spoliation and did not mention spoliation until filing the present motion for judgment as a matter of law.

This Court gives little credit to Nestle's arguments on spoliation. Webb testified that he had his business records "consolidated and put into storage." (Doc. # 160 at 143:4-8). Webb further testified that when he attempted to locate certain bills of lading and other documents, he could not find them because the papers were not properly organized. (Id. at 145:1-5). Contrary to Nestle's arguments, there is no evidence that Specialized intentionally and in bad faith destroyed evidence in this case. Furthermore, Nestle raises arguments concerning spoliation for the very first time in its motion for judgment as a matter of law.

In Bashir v. Amtrak, 119 F.3d 929 (11th Cir. 1997), the court explained that "an adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith." Id. at 931. Further, "Mere negligence in losing or destroying the records is not enough for an adverse inference." Id. In this case, Nestle seeks an order reversing the jury's findings on counts I, II, and V due to Specialized's failure to preserve some

original documents.  Nestle makes these arguments despite the fact that Specialized provided copies of many of the missing documents.

Nestle's request for judgment as a matter of law is not in sync with this Circuit's treatment of spoliation.  Further, because this issue is raised for the first time after the trial, this Court is not in a position to find that Specialized committed spoliation in the first place.

This Court denies Nestle's Rule 50 motion for judgment as a matter of law on all grounds asserted.

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

Nestle's motions for judgment as a matter of law (Doc. ## 146, 174) are **DENIED**.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this <u>9th</u> day of April, 2009.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE


Copies: All counsel of record