SPECIALIZED TRANSPORTATION
OF TAMPA BAY, INC.,

        Plaintiff,

v.                          Case No. 8:06-cv-421-T-33EAJ

NESTLE WATERS NORTH
AMERICA, INC.,

        Defendant.
_____/

## ORDER

This cause comes before the Court pursuant to Nestle's motion for a new trial (Doc. # 175), filed on September 30, 2008. Specialized filed its response in opposition to Nestle's motion for a new trial on October 28, 2008. (Doc. # 184). On November 18, 2008, Nestle filed its reply memorandum in support of its motion for a new trial. (Doc. # 188).

For the reasons that follow, this Court denies Nestle's motion for a new trial.

## I.   Background

This case involved a dispute over the parties' contractual rights and obligations regarding delivery services Specialized provided for Nestle as well as Specialized's reconfiguration of a fleet of vehicles (the "Doubles Program") to accommodate Nestle's shipping needs. Specialized filed

suit against Nestle in state court, and Nestle removed this case to this Court on the basis of diversity of citizenship on March 13, 2006. (Doc. ## 1, 2). Counts I, III, IV, and V of Specialized's amended complaint sought damages against Nestle for breach of contract, and count II sought damages against Nestle for open account. (Doc. # 68).

After several rounds of dispositive motions, this case was set for a jury trial. Prior to trial, the parties filed various motions in limine. Notably, Specialized filed a motion in limine (Doc. # 95) seeking exclusion of certain exhibits related to settlement negotiations between the parties under Rule 408 of the Federal Rules of Evidence.[1] The

---

[1] Federal Rule of Evidence 408 provides:

(a) Prohibited uses. Evidence of the following is not admissible on behalf of any party, when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction:
(1) furnishing or offering or promising to furnish--or accepting or offering or promising to accept--a valuable consideration in compromising or attempting to compromise the claim; and
(2) conduct or statements made in compromise negotiations regarding the claim, except when offered in a criminal case and the negotiations related to a claim by a public office or agency in the exercise of regulatory, investigative, or enforcement authority.

(b) Permitted uses. This rule does not require

2

motion also addressed untimely disclosed exhibits.

After considering both sides' arguments, this Court granted Specialized's motion in limine, finding: "The documents Specialized Transportation seeks to exclude are pre-suit communications between counsel for Nestle and counsel for Specialized Transportation. The letters communicate the parties' attempts to reach a settlement before the initiation of suit." (Doc. # 111 at 4).

After the resolution of all pretrial motions, this case was tried by a jury. (Doc. # 142-145). On September 12, 2008, the jury returned a verdict in favor of Specialized as to all five counts of the amended complaint. (Doc. # 149). This Court entered its judgment in favor of Specialized in the amount of $544,529.33 on September 16, 2008. (Doc. # 162). Thereafter, on September 30, 2008, this Court entered an amended judgment in the same amount. (Doc. # 170).[2] Multiple

> exclusion if the evidence is offered for purposes not prohibited by subdivision (a). Examples of permissible purposes include proving a witness's bias or prejudice; negating a contention of undue delay; and proving an effort to obstruct a criminal investigation or prosecution.

Fed.R.Evid. 408.

[2] This Court's judgment was amended to correct a scrivener's error.

post trial motions, including the present motion for a new trial, followed.

## II. <u>Nestle's Motion for a New Trial</u>

Rule 59 of the Federal Rules of Civil Procedure does not list all of the grounds for a new trial, but instead generally provides that a new trial may be granted "on all or some of the issues . . . to any party . . . after a jury trial, for any reason for which a new trial has heretofore been granted in a suit in equity in federal court." <u>Id.</u>

The Supreme Court noted that a party may seek a new trial on grounds that "the verdict is against the weight of the evidence, that damages are excessive, or that, for other reasons, the trial was not fair to the party moving; and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." <u>Montgomery Ward & Co. v. Duncan</u>, 311 U.S. 243, 251 (1940).

By its present motion, Nestle seeks a new trial pursuant to Rule 59(a) of the Federal Rules of Civil Procedure, arguing: (1) the jury's verdict is against the clear weight of the admissible evidence; (2) this Court erred when it excluded certain evidence; and (3) this Court gave erroneous jury instructions. This Court will address these issues and others

in determining whether a new trial is warranted in this case.

## A.  **Weight of the Evidence**

Nestle asserts that the jury's verdict in favor of Specialized is contrary to the clear weight of the evidence in the case.  In considering Nestle's contentions regarding the weight of the evidence presented at trial, this Court is mindful of the Eleventh Circuit's warning that "[t]he trial judge's discretion to set aside a jury verdict based on the great weight of the evidence is very narrow" and is limited to "protect[ing] against manifest injustice in the jury's verdict." Hewitt v. B.F. Goodrich Co., 732 F.2d 1554, 1556 (11th Cir. 1984).

The Eleventh Circuit explained in Lipphardt v. Durango Steakhouse of Brandon, Inc., 267 F.3d 1183 (11th Cir. 2001):

> A judge should grant a new trial when the verdict is against the clear weight of the evidence or will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict. . . . . Because it is critical that a judge does not merely substitute h[er] judgment for that of the jury, new trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great--not merely the greater--weight of the evidence.

Id. at 1186 (internal citations omitted).  Further, the Eleventh Circuit has noted, "When a new trial is granted on the basis that the verdict is against the weight of the

evidence our review is particularly stringent to protect the litigant's right to a jury trial." Hewitt, 732 F.2d at 1556.

Keeping this high standard in mind, this Court will evaluate Nestle's motion for a new trial concerning the weight of the evidence.

### 1.   Evidence Regarding the Oral Contract

As to count V, the jury found by a preponderance of the evidence that "Specialized Transportation and Nestle entered into an oral contract obligating Nestle to make up-front payment to Specialized Transportation of start-up costs relating to a tandem trailer configuration (the Doubles Program), if the parties did not enter into a final, written contract regarding the Doubles Program." (Doc. # 149 at 3). The jury also found that the oral contract between Specialized and Nestle was "capable of being performed in one year." (Id.) Furthermore, the jury found that Joel Adams, Nestle's regional manager for distribution and transportation for the Southeast, had either actual or apparent authority to bind Nestle to the oral contract and that Nestle breached the oral contract. (Id.) The jury awarded Specialized $522,449 for Nestle's failure to perform as to count V ($585,000 reduced by $62,551 due to Specialized's mitigation of damages). (Id.)

Nestle asserts that the jury's award as to count V should

be overturned because Specialized failed to prove: (1) that there was a meeting of the minds as to the essential terms of the oral contract; (2) that the parties intended to be bound by an oral, rather than a written, contract; (3) that Adams had apparent authority to bind Nestle to the oral contract; (4) that Specialized was capable of performing the terms of the oral contract; and (5) that Nestle breached the oral contract.

In response, Specialized points to evidence supporting the elements Specialized was required to prove by a preponderance of the evidence to prevail on count V.

### i. __Meeting of the Minds__

This Court evaluated the enforceability of the parties' oral contract in its order denying Nestle's motion for judgment as a matter of law, which was issued on April 9, 2009. (Doc. # 191). In the context of Nestle's motion for a new trial, this Court will again undertake an analysis of the enforceability of the oral contract, and the evidence on the record in support of Specialized's claim that Nestle breached the oral contract to pay Specialized's start-up costs for the Doubles Program.

In <u>Venus Lines Agency, Inc. v. CVG Int'l Am, Inc.</u>, 234 F.3d 1225 (11th Cir. 2000), the court held, "In order to form

an enforceable contract, there must be a meeting of the minds on all essential terms and obligations of the contract." Id. at 1229.  In this case, Bobby Webb, president of Specialized, testified that "the oral agreement was to develop a three-year contract and to make us whole on all of our start-up costs. It's just that simple." (Doc. # 160 at 81:12-14).

Adams initially authorized Specialized to procure the equipment that would be used to create a test rig for the Doubles Program. (Doc. # 158 at 150:20-25).  Adams testified that he did not require a written contract because "the advantages that we saw from a cost standpoint were so significant that we wanted to immediately implement this in order to enjoy those benefits for . . . Nestle Waters." (Id. at 151:7-10).

This Court recognizes that the parties did not reach an agreement as to the exact amount of the start-up costs; however, in light of the circumstances leading up to the oral contract, this Court determines that the absence of a specific amount for the start-up costs did not prevent a meeting of the minds.  Adams instructed Specialized to purchase specific pieces of equipment to test the Doubles Program, and the Doubles Program passed the initial tests.  Adams testified:

Well, we did the trial.  The idea behind the trial

> was to prove that the concept can work; that the
> Florida DOT will let us do this . . . . And we were
> successful in that.  At that point it really, uh,
> became more an issue of how quickly would we be
> able to ramp this up to a larger scale.

(Doc. # 158 at 152:3-9).  Adams, eager to decrease shipping

costs for Nestle, authorized Specialized to "begin growing the

fleet" of Doubles trailers. (<u>Id.</u> at 156:1-4).  Adams testified

that during this "development phase" of the Doubles Program,

he "made assurances to Specialized that if for some reason the

program gets terminated at this point, that we would make them

whole on their out-of-pocket costs." (<u>Id.</u> at 12-17).

Specialized complied with Adams' request to "ramp up" the

fleet, and Specialized purchased the equipment necessary to

create ten Doubles trailers. (<u>Id.</u> at 163:1-5).  It is not

disputed that the exact start-up costs for the Doubles Program

were not known until after the parties entered into the oral

contract; however, both Webb and Adams, individuals in the

shipping industry, were capable of determining the approximate

cost of purchasing the tractors, dollies, and other equipment

needed for initiating the Doubles Program fleet.

The absence of a specific monetary figure--Specialized's

start-up costs--did not prevent a meeting of the minds between

Webb and Adams.  <u>See</u> <u>Bee Line Air Transport, Inc. v. Dodd</u>, 496

So.2d 874, 875 (Fla. 3d DCA 1986)("[A] contract with an open

price term will not fail for indefiniteness if the parties provide an objective method of determining price."); <u>Blackhawk Heating & Plumbing Co. v. Data Lease Financial Corp.</u>, 302 So.2d 404, 408 (Fla. 1974)("Even though all the details are not definitely fixed, an agreement may be binding if the parties agree on the essential terms and seriously understand and intend the agreement to be binding on them."). Accordingly, the jury's finding that the parties entered into the oral contract (including the implicit finding that there was a meeting of the minds on all essential terms) is not against the great weight of the evidence, and this court will not disturb the jury's findings by ordering a new trial.

### ii.   Intent to be Bound by an Oral Contract

Nestle also argues that the oral contract was unenforceable because Nestle intended to be bound only upon the execution of a written contract. Specialized, on the other hand, asserts that no writing was required because the parties intended to be bound by the oral contract, regardless of whether a written contract was reached in the future.

As explained by the Eleventh Circuit in <u>Venus Lines</u>, "It is not necessary to reduce an agreement to writing to bind the parties, as long as the parties intend to be bound at the time of the oral agreement." 234 F.3d at 1229.

It is not contested that the parties contemplated entering into a written contract. Webb testified: "It was very important to me, since we had no commitment to all of this equipment that we were modifying and building, it was very important to me to have a commitment, and had to be in writing, and [Adams] knew that." (Doc. # 159 at 129:14-17).

Furthermore, when Adams was asked why he made such a promise, Adams testified, "Very common practice at Nestle at the time when I was there. The business we were in was extremely fast-paced. So, oftentimes in order to initiate a program, we would come to an oral or verbal agreement and then follow up with a written contract shortly thereafter." (Doc. # 158 at 159:4-9).

Nestle relies upon <u>Cherokee Oil Co., Ltd. v. Union Oil Co.</u>, 706 F. Supp. 826, 829 (M.D. Fla. 1989) for the proposition that "when the parties intend that the negotiations be reduced to a formal writing, there is not a binding contract until the writing is executed." The court's holding in <u>Cherokee Oil</u>, in which the defendant did not intend to be bound until a written agreement was signed and where the plaintiff only "dreamed" that such contract would be signed, is not applicable to the present case. <u>Id.</u> at 829.

The Florida Supreme Court held in <u>Ocala Cooperage Co. v.</u>

<u>Fla. Cooperage Co.</u>, 52 So. 13 (Fla. 1910), "[T]he mere suggestion or intention to put the agreement in writing at a subsequent time is not, of itself, sufficient to show that the parties did not intend the parole contract to be regarded as complete and binding without being put in writing." <u>Id.</u> at 16. Harmonizing <u>Cherokee Oil</u> and <u>Ocala Cooperage</u>, the Eleventh Circuit explains:

> Under Florida law where the parties do not intend to be bound by the agreement (oral or written) until a formal written contract is executed, there is no binding agreement unless and until the written contract is in fact executed. However, the parties intent, of course, is what ultimately controls. Simply because the parties contemplated the drafting of a subsequent formal, written contract, does not denote that they did not intend to be bound by their oral or written negotiations.

<u>Lifecare Int'l v. CD Medical</u>, 68 F.3d 429, 436 (11th Cir. 1995)(internal citations omitted).

The record evidence in this case supports a finding that the parties intended to be bound by the oral contract regardless of whether a separate written contract was entered into in the future; accordingly, a new trial is not warranted based upon Nestle's argument that a written contract was contemplated.

### iii. <u>Adams' Authority to Bind Nestle</u>

Nestle also asserts that Specialized failed to present

evidence upon which a jury could find that Adams had apparent authority to bind Nestle to the oral contract.

The Eleventh Circuit has had the opportunity to explore the boundaries of Florida agency law on many occasions, and has held:

> Whatever evidence has a tendency to prove an agency is admissible, even though it be not full and satisfactory, and it is the province of the jury to pass upon it. Direct evidence is not indispensable--indeed, frequently is not available--but instead circumstances may be relied on, such as the relation of the parties to each other and their conduct with reference to the subject-matter of the contract. And, notwithstanding the alleged principal and agent are the only witnesses called, and they both categorically deny the existence of the relation, the jury have the right to weigh and consider the whole of the evidence and the fair and reasonable inferences that might be drawn therefrom, and they may be entirely justified in disregarding the "Yes and No" answers in reaching the conclusion that the evidence as a whole is sufficient to prove the relation of agency to exist.

Overseas Private Invest. Corp. v. Metro. Dade County, 47 F.3d 1111, 1114 (11th Cir. 1995)(citing Watkins v. Sims, 88 So. 764, 733 (Fla. 1921)).

In the present case, Adams testified that he worked for Nestle from 1998 until 2002, and held the position of regional manager for distribution and transportation for the southeast. (Doc. # 158 at 104:8-13). He testified that he was responsible for "trucking moves, warehousing and physical

distribution" for Florida, Alabama, Georgia, and Louisiana. (<u>Id.</u> at 19-22). Adams testified that, at one point, he had sixty-three people reporting to him and that his yearly budget was between 12 and 14 million dollars. (<u>Id.</u> at 105:7-11).

In 2001, Adams authored an RFP (request for proposal) for transportation services. (<u>Id.</u> at 107:15-22). Adams testified that his name was the only name on the RFP and when asked "what persons were held out by Nestle to the public as the point of contact for the RFP?" Adams testified that he was the only one. (<u>Id.</u> at 110:21-23). Adams added, "I think it was very important when you do an RFP that you have a single point of contact, so all questions or requests for clarification be funneled through a single person." (<u>Id.</u> at 110:23-25, 111:1).

Nestle points to testimony from Charles Carver, one of Specialized's employees, who testified that he "knew from the very beginning that Joel Adams did not have the authority to sign the written contract that . . . [Specialized] was negotiating." (Doc. # 159 at 26:5-9). However, Carver clarified that Specialized implemented the Doubles Program upon Adams' authority, but that it was beyond Adams' authority to approve a three-year contract for use of the Doubles Program. (<u>Id.</u> at 28:18-25; 29:1-11). Carver did not testify that Adams lacked authority to bind Nestle to an oral contract

to initiate the Doubles Program.

There is evidence on both sides of the equation regarding Adams' authority to bind Nestle. Because Adams was the only person named on the RFP that Specialized responded to, and because Adams had the title of "regional manager for distribution and transportation for the southeast" along with the fact that Nestle gave him a budget of 12 to 14 million dollars per year, the jury's agency finding was not against the great weight of the evidence. Accordingly, a new trial on the basis of Adams' lack of authority is not warranted.

### iv. <u>Ability to Perform and Breach</u>

Nestle also contends that Specialized presented insufficient evidence for the jury to conclude that Specialized was capable of performing the Doubles Program and that Specialized failed to prove that Nestle breached the oral contract.

In <u>Wackenhut Corp. v. Conner</u>, 420 So.2d 383 (Fla. 3d DCA 1982), the court held, "In order to maintain an action for breach of an oral contract a plaintiff must first establish performance on its part of the contractual obligations assumed." <u>Id.</u> at 384. Nestle essentially argues that Specialized failed to submit permits for 2002 and 2003, showing that the Florida Department of Transportation would

have allowed Doubles trailers to operate on the Florida Turnpike. (Doc. # 175 at 22).

In response, Specialized points to Carver's testimony that Specialized received proper permitting from the Florida Department of Transportation for the vehicles and equipment in question. (Doc. # 159 at 24:24-25; 25:1-8). While this evidence is not overwhelming, it is sufficient, when viewed in conjunction with Webb and Adams' testimony, to support the jury's implicit finding that Specialized was capable of performing the terms of the oral contract.

In addition, Nestle argues that Specialized "did not prove that Nestle breached the oral contract, as there is no evidence that Nestle refused to negotiate or sign a final, written contract." (Doc. # 175 at 22). The evidence submitted at trial tells a different story. Specialized submitted a signed written contract to Nestle that complied with the parties' prior negotiations. (Doc. # 158 at 161:11-25). Nestle never signed the contract. (Id. at 252:7-20). Webb testified that after Adams left, Nestle terminated the Doubles Program and never paid the start up costs. (Id. at 12-13; Doc. # 159 at 134:13-16).

In light of this testimony, this Court will not disturb the jury's finding that Nestle breached the oral contract as

specified in count V of the amended complaint.

In summary, this Court determines that the jury's verdict in favor of Specialized as to count V of the amended complaint was not against the great weight of the evidence.

## 2. Evidence of Damages

The jury awarded Specialized $12,730.33 on count I of Specialized's complaint (for breach of contract relating to the provision of transportation services); $12,730.33 on count II of Specialized's complaint (for open account); $6,200 on count III (for breach of contract based on Nestle's failure to return rented trailers); $3,150 on count IV (for breach of contract based on Nestle's failure to pay rent on rented trailers); and $522,449 on count V (for breach of the aforementioned oral contract). (Doc. # 149 at 1-4).[3]

Nestle contends that the jury's damages award as to all counts was rendered in contravention of the great weight of the evidence because Specialized failed to offer evidence that it was damaged by Nestle. Specifically, as to count V, Nestle

---

[3] Counts I and II were both predicated upon Nestle's failure to pay for Specialized's transportation services. The jury awarded $12,730.33 for both count I and II. The verdict form reminded jurors that "if you awarded damages to Specialized Transportation on Count I, you should still consider Count II. Damages may not be duplicated; however, it is necessary that you consider and resolve the issues on each of the counts." (Doc. # 149 at 1).

argues, "Specialized did not prove the existence or amount of any actual damages." (Doc. # 175 at 23). As to counts I and II, Nestle argues, "Specialized did not meet its burden of proving that it complied with the parties' Letter Agreement's conditions precedent to payment of its delivery invoices." (Id.) As to counts III and IV, Nestle asserts:

> Specialized relied solely upon Webb's testimony as to the existence of oral agreements obligating Nestle to pay for the return or rental of Specialized's trailers. . . . Specialized did not present any documentary evidence proving the existence of these oral agreements. Specialized failed to present any documentary proof of its entitlement to relief on any of its claims because it failed to take reasonable measures to preserve any of its business records or documents when it commenced suit in February 2004.

(Doc. # 175 at 25).

Nestle contends that Specialized failed to present evidence that it purchased the ten tractors, twenty-three trailers, and ten dollies in question, and further contends that Specialized failed to document how much it received for this equipment upon resale.

In addition, Nestle contends that it was improper for this Court to allow Webb to offer hearsay testimony about invoicing and other conditions precedent to payment by Nestle under the business records exception because Webb lacked personal knowledge about Specialized's invoices. This Court

will address these issues in turn.

### i.  Count V

With respect to the jury's award on count V, Carver testified, from personal knowledge, that Specialized purchased ten used tractors. (Doc. # 158 at 238:20-24).  He also testified that Specialized purchased twenty trailers, ten converter dollies, and other equipment. (Id. at 239:1-23). Webb testified, "I purchased twenty-three trailers, nine tractors, and ten dollies." (Doc. # 159 at 112:11-12).  There are some differences between Webb and Carver's testimony, but the jury had a suitable foundation upon which to find that the equipment was purchased.  And it should be noted that there is no contrary evidence on the record, such as evidence that the equipment was not actually purchased.[4]  Webb testified that Specialized spent over $949,998 to start-up and ramp-up the

_____

[4] Nestle asserts that Webb Truck Leasing, Inc., rather than Specialized, financed the equipment in question because Webb Truck Leasing, Inc. appears on certain financing documents. (Doc. # 175 at 23).  However, Webb testified that Webb Truck Leasing, Inc. was utilized because it had an open line of credit and that Specialized could not obtain credit at that time. (Doc. # 159 at 113:14-25).  Webb testified that there was an understanding between the related companies that Specialized was responsible for the payments owed by Webb Truck Leasing, Inc. (Id. at 114:4-20).  Specifically, Webb testified that, with respect to the financing agreement for the equipment, "Specialized Transport made all payments to this agreement." (Id. at 14-17).  The jury was free to accept this testimony as credible.

Doubles Program. (Doc. # 159 at 127:1-13).

Webb also offered testimony about the resale of the equipment in question. Webb testified that he was able to sell nine tractors, twenty-three trailers, and ten dollies. (Doc. # 160 at 117:5-22). However, Webb testified that he no longer possessed the records reflecting the value he received for the equipment. (Id. at 120:17-20). Webb later referenced his tax documents, which were entered into evidence, and he was able to confirm some of the values that he received upon resale of the Doubles Program equipment. He testified that he sold three "Wabash" trailers for $2,420. (Doc. # 160 at 158:4-11). Further, he testified that he sold sixteen "Dorsey" trailers for $15,131. (Id. at 158:22-25; 159:1-2). It is true that these figures do not amount to $62,551 (the jury's mitigation total); however, because Webb testified that he sold all of the equipment, the jury's mitigation finding was not against the great weight of the evidence. In conclusion, the jury's verdict in favor of Specialized on count V, in the amount of $522,449, was not against the great weight of the evidence.

## ii. <u>Counts I-IV</u>

Nestle contends that Specialized failed to prove its damages on counts I-IV. Nestle specifically argues that this

20

Court erred when it allowed Webb, Specialized's president, to offer testimony regarding some business records that Specialized was not able to locate prior to trial. Specifically, Nestle argues:

> Webb had no personal knowledge of the preparation of a single invoice or that a proof of delivery or signed accessorial charge authorization form was presented to Nestle with each unpaid invoice, as required by the parties' contract. This Court erred in allowing Specialized to use the business records exception to elicit hearsay testimony from Webb as to the contents of Specialized business records.

(Doc. # 175 at 24).

This Court is not receptive to Nestle's arguments on this point. During the trial, Nestle argued that Webb was not qualified to testify regarding Specialized's business records. This Court considered the parties' arguments on this point, and after conducting its research and deliberations, ruled that Webb could offer the proffered testimony. Specifically, this Court determined: "I'm satisfied, he's given enough information to satisfy the business record exception. I'm allowing you to admit it into evidence. . . . [H]e knew who was owed money and who wasn't owed money. He did testify [the invoices] were kept in the regular course of business. Based on that, on the fact that he's the president of the company, I've allowed that to come in." (Doc. # 159 at 156:14-16;

158:8-14).  Webb was qualified to offer testimony regarding Specialized's business records, particularly its invoices to Nestle and Specialized's satisfaction of Nestle's conditions precedent to payment.  As such, the jury was permitted to consider Webb's testimony and find in favor of Specialized on counts I-IV.

## B.  Exclusion of Exhibits

In addition to arguing that the jury's verdict was rendered in contravention of the clear weight of the evidence, Nestle argues that a new trial is necessary because this Court improperly excluded certain exhibits.  Specifically, Nestle argues that this Court should not have excluded exhibits ## 7, 23, 34, 41, and 42.  (Doc. # 175 at 25).[5]  Exhibits ## 7, 23,

---

[5]Nestle appears to argue, in passing in a footnote, that this Court improperly excluded exhibits ## 37 and 56-59. (Doc. # 175 at 27-28). Specialized filed a motion in limine to exclude exhibits ## 37-40 on the basis of untimely disclosure. (Doc. # 95).  Nestle responded to the motion in limine as to exhibits ## 37-40 by noting "Nestle has elected to withdraw exhibits . . . 37-40, thereby rendering moot Specialized's motion as to those exhibits." (Doc. # 104).  Accordingly, this Court finds that Nestle waived any objection to the exclusion of exhibits ## 37-40.  Even if Nestle had not waived its objection to exclusion of exhibits ## 37-40, the exclusion of these exhibits was proper because these exhibits were untimely disclosed to Specialized after the close of discovery. Furthermore, this Court properly excluded exhibits ## 56-59. It is not contested that these exhibits were tendered to Specialized on the eve of trial.  A new trial is not warranted due to the exclusion of exhibits ## 37 and 56-59.

and 34 were excluded by this Court pursuant to Federal Rule of Evidence 408, after this Court determined that the exhibits constituted confidential settlement documents. Exhibits ## 41 and 42 were excluded by this Court pursuant to Federal Rule of Evidence 403, after finding that the probative value of these documents (prior complaints in this action) would be outweighed by the danger of jury confusion.

Pursuant to Federal Rules of Evidence 103(a), a court may not overturn a jury's verdict based on alleged errors in evidentiary rulings unless a party's substantial rights have been affected by the rulings. <u>See</u> <u>Haygood v. Auto-Owners Ins. Co.</u>, 995 F.2d 1512, 1515 (11th Cir. 1993)("Evidentiary rulings are reviewed under an abuse of discretion standard [and] [e]rror in the admission or exclusion of evidence is harmless if it does not affect the substantial rights of the parties.").

This Court's evidentiary rulings do not provide a basis for a new trial. After being fully briefed on the matter, this Court entered a lengthy order addressing exhibits ## 7, 23, and 34. (Doc. # 111). This Court carefully evaluated the exhibits, clearly labeled "FOR SETTLEMENT PURPOSES ONLY" and determined that the exhibits fell within the category of documents protected from disclosure by Federal Rule of

Evidence 408.

In making this determination, this Court considered the Advisory Committee Notes to Rule 408, which explain that the primary purpose of the rule is to promote the public policy favoring the compromise and settlement of disputes. This Court also considered and discussed binding Eleventh Circuit law, such as <u>Blu-J, Inc. v. Kemper C.P.A. Group</u>, 916 F.2d 637 (11th. Cir. 1990).

This Court recognized that it was required to "balance Nestle's desire to present evidence of Specialized Transportation's prior negotiations . . . against the need in every case to promote free flowing settlement negotiations." (Doc. # 111 at 6). In the end, this Court excluded the settlement documents, and this Court's exclusion of such evidence does not mandate a new trial.

Likewise, this Court exclusion's of exhibits ## 41 and 42, which are Specialized's state court complaint (Doc. # 2) and Specialized's complaint filed in a separate case (8:04-cv-724-T-26MAP) under Rule 403 of the Federal Rules of Evidence does not warrant a new trial. Nestle asserts, "Specialized's objection to these documents under Fed.R.Evid. 403 was not supported by any articulated rationale as to why it would be unfairly prejudicial to Specialized for Nestle to question

Webb about statements made in documents which he verified under oath as being true." (Doc. # 175 at 27).

Federal Rule of Evidence 403 states, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Nestle correctly argues in its reply that "Rule 403 is an extraordinary remedy which should be used sparingly." (Doc. # 188 at 9)(citing U.S. v. King, 713 F.2d 627, 631 (11th Cir. 1983)). However, this Court agrees with Specialized that exclusion of the prior complaints was necessary to prevent jury confusion regarding the identity of the operative complaint and the claims currently asserted, as opposed to prior claims that have been abandoned, modified, adjudicated, or otherwise rendered obsolete.

Thus, this Court roundly rejects Nestle's argument that a new trial is warranted due to the exclusion of settlement documents, untimely disclosed documents, and Specialized's prior complaints.

**C.** **Jury Instructions**

Nestle contends that a new trial is warranted based upon

this Court's instructions to the jury regarding Adams'
authority to bind Nestle (Jury Instruction No. 12) and
Specialized's burden with respect to proving its damages (Jury
Instruction No. 14). As to both instructions, Nestle asserts
that this Court failed to instruct the jury that Specialized,
rather than Nestle, bore the burden of proof under Florida
law.

The Eleventh Circuit has noted:

> So long as the instructions accurately reflect the
> law, the trial judge is given wide discretion as to
> the style and wording employed in the instructions.
> On appeal, we examine whether the jury charges,
> considered as a whole, sufficiently instructed the
> jury so that the jurors understood the issues and
> were not misled. Under this standard, if the jury
> charge as a whole correctly instructs the jury,
> even if it is technically imperfect, no reversible
> error has been committed. We must reverse an
> erroneous instruction, however, if we are left with
> a substantial and ineradicable doubt as to whether
> the jury was properly guided in its deliberations.

Bateman v. Mnemonics, Inc., 79 F.3d 1532, 1543 (11th Cir.
1996)(internal citations and quotations omitted). This Court
will analyze the parties' arguments under this rubric.

### 1. **Jury Instruction No. 12**

With respect to Nestle's defense that Adams lacked the
authority to bind Nestle, this Court instructed the jury as
follows:

The second defense raised by Nestle is that Joel

Adams lacked the authority to bind Nestle into the contract that is the subject of Count Five of Specialized Transportation's Complaint. Under Florida law, a principal, in this case Nestle, is not liable for or bound by the acts or contracts of the agent, in this case Joel Adams, if the agent is not acting within the scope of his actual or apparent authority. An agency relationship may be found even though the principal, in this case Nestle, denies the existence of such a relationship.

The first issue for you to determine on Nestle's lack of authority defense is whether Adams had actual authority from Nestle to enter into the contract. Under Florida law, actual authority to enter into a contract may be inferred from acts, conduct, and other circumstances suggesting that Joel Adams had authority to bind Nestle. Further, actual authority exists if Adam's act is within the scope of his employment. An act is considered within the scope of the employment if the conduct engaged in is the kind of conduct that Adams was employed to perform and was activated in part by a purpose to serve Nestle.

If you find by a preponderance of the evidence that Joel Adams did not have actual authority, then the second issue for you to determine under Nestle's lack of authority defense is whether Adams had the apparent authority to enter into the contract. Under Florida law, apparent authority exists if: (a) Nestle made a representation relating to Adams's authority; (b) Specialized Transportation relied on that representation; and (c) whether Specialized Transportation changed position in reliance upon that representation.

If the preponderance of the evidence supports Nestle's defense that Adams lacked actual authority and apparent authority to enter into the contract, your verdict must be for Nestle as to Specialized Transportation's fifth claim. However, if the preponderance of the evidence does not support the defense that Adams lacked the actual authority or the apparent authority to enter into the contract, you should consider Nestle's final defense, that of mitigation of damages.

(Doc. # 147 at 25).

Nestle argues that this instruction improperly placed the burden of proof on Nestle, rather than Specialized, to prove the agency relationship between Nestle and Adams. The Florida Supreme Court articulated in Lee v. Melvin, "When plaintiff in a civil action seeks to recover upon a contract alleged by him to have been made with the defendant through the latter's agent, the burden of proof is upon plaintiff to show the authority of the agent for making the contract." 40 So.2d 837, 838 (Fla. 1949)(internal citations omitted).

Nevertheless, this Court is satisfied that its instructions fully comported with Florida law. Though specific burden allocation instructions were lacking with respect to the agency instruction, the instruction did not explicitly or implicitly allocate the burden to Nestle, as Nestle alleges.

### 2. Jury Instruction No. 14

With respect to Specialized's damages, this Court instructed the jury:

> If, after considering all of Nestle's defenses, you find for Nestle, you will not consider the matter of damages. But, if you find for Specialized Transportation, you should award Specialized Transportation an amount of money that the preponderance of the evidence shows will fairly and

adequately compensate it for damages caused by Nestle's failure to perform. Specialized Transportation is entitled to recover only those damages that will put it in the same position that it would have been in if Nestle had performed its duties under the contract. However, Specialized Transportation is entitled to recover only those damages that the parties reasonably could have anticipated, at the time they entered into the contract, probably would result from Nestle's failure to perform.

Of course, the fact that I have given you instructions concerning the issue of Specialized Transportation's damages should not be interpreted in any way as an indication that I believe that Specialized Transportation should, or should not, prevail in this case.

(Doc. # 147 at 28).

This Court further instructed the jury, in Jury Instruction No. 13:

The third defense raised by Nestle is that Specialized Transportation failed to mitigate its damages as to Count Five of the Complaint. You are instructed that any person who claims damages as a result of an alleged wrongful act on the part of another has a duty under the law to "mitigate" those damages – that is, to take advantage of any reasonable opportunity that may have existed under the circumstances to reduce or minimize the loss or damage.

So, if you should find from a preponderance of the evidence that Specialized Transportation failed to seek out or take advantage of a business or employment opportunity that was reasonably available under all the circumstances shown by the evidence, then you should reduce the amount of Specialized Transportation's damages by the amount that could have been reasonably realized if Specialized Transportation had taken advantage of such opportunity.

Likewise, if you find that Specialized

> Transportation did, in fact, mitigate its damages,
> you should reduce the amount of Specialized
> Transportation's damages by the amount that
> Specialized Transportation was able to recoup by
> taking advantage of business opportunities.

(Doc. # 147 at 27).

Although this Court specifically instructed the jury on the principle of mitigating damages, using the Eleventh Circuit Pattern Jury Instruction, Nestle argues that this Court improperly instructed the jury and placed the burden of proof on Nestle. Specifically, Nestle contends, "Specialized bore the burden of proving its actual out-of-pocket costs by netting-off the profits realized from its use (for Velda Farms and Pepsi Cola) and sale of doubles equipment." (Doc. # 175 at 29).[6] Furthermore, in drafting Jury Instruction No. 14, this Court utilized the Florida Standard Jury Instructions for breach of contract. See Florida Instruction MI 12.1.

This Court "is given wide discretion as to the style and wording employed in the instructions." Bateman, 79 F.3d at 1543. This Court was not compelled by Florida law or Federal

---

[6] In support of this proposition, Nestle cites Latour Auto Sales, Inc. v. Stromb-Carlson Leasing Corp., 335 So.2d 600 (Fla. 3d DCA 1976), a case in which the court reversed the grant of summary judgment because there was no evidence in the record of the value of a repossessed vehicle in a leasing case. The Latour case did not involve the issue of jury instructions.

law to draft the instructions as specifically as Nestle suggests. The jury was properly instructed, and no new trial is warranted.

In conclusion, Nestle failed to demonstrate that the jury's verdict was rendered against the great weight of the evidence, that a miscarriage of justice resulted from the jury's verdict, or that this Court's procedural and evidentiary rulings (including its jury instructions, exclusion of exhibits, and other rulings) affected Nestle's substantial rights or otherwise caused injustice or prejudice to Nestle. Accordingly, this Court will not disturb the jury's verdict and denies Nestle's motion for a new trial.

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

Nestle's motion for a new trial (Doc. # 175) is **DENIED.**

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this <u>19th</u> day of April, 2009.

_____
VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies: All counsel of record